ROVNER, Circuit Judge.
The district court entered a preliminary injunction in favor of the plaintiffs, a number of religious, not-for-profit organizations, preventing the defendants from applying or enforcing the so-called “contraceptive mandate” of the Patient Protection and Affordable Care Act of 2010 (“ACA”) to the See 42 U.S.C. § 300gg-13(a)(4); Pub.L. No. 111-148, 124 Stat. 119 (2010). The plaintiffs contend that the ACA’s accommodations for religious organizations impose a substantial burden on their free exercise of religion, and that the ACA and accompanying regulations are not the least restrictive means of furthering a compelling government interest, in violation of the’ rights under the Religious Freedom Restoration Act of 1993 (“RFRA”). See 42 U.S.C. § 2000bb et seq. The defendants, several agencies of the United States government, appeal. We conclude that ACA does not impose a substantial burden on the’ free exercise rights and so we reverse and remand. However, we will maintain the injunction for a period of sixty days in order to allow the district court adequate time to address additional arguments made by the parties but not addressed prior to this appeal.
I.
The ACA requires group health plans and third-party administrators of self-insured plans to cover preventive care for women under guidelines supported by the Health Resources and Services Administration (“HRSA”), a component of the Department of Health and Human Services (“HHS”). 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130(a)(l)(iv); University of Notre Dame v. Burwell, 786 F.3d 606, 607 (7th Cir.2015) (hereafter “Notre Dame II”); University of Notre Dame v. Sebelius, 743 F.3d 547, 548 (7th Cir.2014), vacated by — U.S.-, 135 S.Ct. 1528, 191 L.Ed.2d 557 (2015) (hereafter “Notre Dame /”). The relevant guidelines include “all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.” 77 Fed.Reg. 8725-26. The regulations adopted by the three Departments implementing this part of the ACA require coverage of, among other things, all of the contraceptive methods described in the guidelines. See 45 C.F.R. § 147.130(a)(l)(iv)(HHS); 29 C.F.R. § 2590.715-2713(a)(l)(iv) (Labor); 26 C.F.R. § 54.9815-2713(a)(l)(iv) (Treasury).[1]
In anticipation of objections from religious organizations to these requirements, the Departments provided an exemption *792 from the contraception coverage provision for religious employers. 45 C.F.R. § 147.131(a). A religious employer is defined as “an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (in) of the Internal Revenue Code of 1986, as amended.” 45 C.F.R. § 147.131(a); 26 U.S.C. § 6033(a)(3)(A). That provision of the Internal Revenue Code, in turn, refers to “churches, their integrated auxiliaries, and conventions or associations of churches,” and “the exclusively religious activities of any religious order.” 26 U.S.C. § 6033(a)(3)(A)(i) and (iii). But the exemption did not cover religiously-affiliated non-profit corporations such as schools and hospitals that did not meet the IRS guidelines for religious employers. The Departments therefore adopted additional regulations providing accommodations for group health plans provided by these nonprofit religious corporations, called “eligible organizations” in the regulations:
(b) Eligible organizations. An eligible organization is an organization that satisfies all of the following requirements:
(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(l)(iv) on account of religious objections.
(2) The organization is organized and operates as a nonprofit entity.
(3) The organization holds itself out as a religious organization.
(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.
45 C.F.R. § 147.131(b).[2] See also 78 Fed. Reg. 39,874-75.
Eligible organizations are not required “to contract, arrange, pay, or refer for contraceptive coverage” to which they have religious objections. 78 Fed.Reg. 39,874. The government developed a two-page form for eligible organizations to use to comply with this accommodation, the “EBSA Form 700 — Certification.”[3] The short form requires the eligible organization to supply its name, the name and title of the individual authorized to make the certification on behalf of the organization, and a mailing address and telephone number for that individual. The form also requires a signature verifying the statement, “I certify the organization is an eligible organization (as described in 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)) that has a religious objection to providing coverage for- some or all of any contraceptive services that would otherwise be required to be covered.” The organization must then provide a copy of the certification to the organization’s health insurance issuer or, for self-insured plans, to its third-party administrator. The insurer or administrator receiving the certification is obligated to provide (or arrange for the provision of) contraception coverage for the health plan’s participants without cost sharing through alternate mechanisms established *793 by the regulations. 45 C.F.R. § 147.131(c). The insurer[4] may not impose a charge of any variety, either directly or indirectly, on the eligible organization for the provision of contraception services.[5] The insurer must also inform plan participants that the eligible organization will not provide or fund any contraception coverage. 45 C.F.R. § 147.131(d). As we will discuss below, since the filing of this suit, these regulations have been amended to allow a second method of objecting to contraceptive coverage, by notifying HHS directly of any religiously-based objection.
The plaintiffs are various religiously-based non-profit organizations including the Diocese of Fort Wayne-South Bend, Inc. (“Diocese”); Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc. (“Catholic Charities”); Saint Anne Home & Retirement Community of the Diocese of Fort Wayne-South Bend, Inc. (“St. Anne Home”); Franciscan Alliance, Inc.; Specialty Physicians of Illinois LLC (“Specialty Physicians”); University of Saint Francis (“St. Francis”); Our Sunday Visitor, Inc. (“Sunday Visitor”); Biola University, Inc. (“Biola”) and Grace Schools. The plaintiffs objected below to the regulatory scheme, which they characterize as a “contraceptive services mandate,” on numerous grounds. Primarily, they asserted that the regulations force them to participate in a system that contravenes their religious beliefs in violation of the RFRA. 42 U.S.C. § 2000bb et seq.[6] In particular, they are forced to contract with insurers or third-party administrators that will provide their employees (and, in some cases, their students) with coverage for contraceptives, sterilization, and abortion-inducing products, all in violation of their deeply held religious beliefs. The accommodation provides them no relief, they contended below, because it causes them to trigger and facilitate the same objectionable services for their employees and students. A non-complying employer[7] who does not meet an exemption faces fines of $2000 per year per full time employee[8] for not pro *794 viding insurance that meets coverage requirements, 26 U.S.C. § 4980H(e), or $100 per day per employee for providing insurance that excludes the required contraceptive coverage, 26 U.S.C. § 4980D, and will face the risk of other enforcement actions.
The Diocese itself is exempted from challenged requirements under the religious employer exemption,[9] and the remaining plaintiffs are subject to the accommodation for nonprofit, religiously-affiliated employers. The government does not contest the sincerity of the plaintiffs’ religious objections to the required contraceptive coverage. Moreover, all of the plaintiffs consider the provision of health insurance for their employees and students to be part of their religious mission.
Although the plaintiffs concede that they are not required to pay for the objectionable services, they contended in the district court that being forced to contract with insurers or third-party administrators who must then provide those services makes them a facilitator of objectionable conduct, complicit in activity that violates their core religious beliefs. The plaintiffs also asserted below that the government’s interest in providing contraceptive services is not compelling and that the means the government employed are not the least restrictive available to achieve the government’s goals. On those bases, the plaintiffs sought and received a preliminary injunction in the district court.
The district court noted that the RFRA prohibits the federal government from placing substantial burdens on a person’s exercise of religion unless it can demonstrate that applying the burden is “in furtherance of a compelling governmental interest,” and is the “least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000bb-l(a) and (b). The court first considered whether the contraception regulations create a substantial burden on eligible employers in light of the accommodation provided by the regulations. Citing our opinion in Korte v. Sebelius, 735 F.3d 654 (7th Cir.2013), cert. denied, — U.S. -, 134 S.Ct. 2903, 189 L.Ed.2d 856 (2014), the court noted that “the pertinent inquiry for the substantial burden test under RFRA is whether the claimant has an honest conviction that what the government is requiring or pressuring him to do conflicts with his religious beliefs and whether the governmental pressure exerts a sufficiently coercive influence on the plaintiffs’ religious practice.” Grace Schools v. Sebelius, 988 F.Supp.2d 935, 950 (N.D.Ind.2013); Diocese of Fort Wayne South Bend, Inc. v. Sebelius, 988 F.Supp.2d 958, 972 (N.D.Ind.2013). The court found that the plaintiffs sincerely believe that the accommodation compels them to facilitate and serve as a conduit for objectionable contraceptive services for their employees and students. If the plaintiffs want to provide health insurance for their students and employees as part of their religious mission (and in order to avoid the fines imposed by the ACA on employers who fail to meet coverage requirements), the court reasoned, then they must either provide the objectionable *795 coverage themselves or comply with the accommodation.
And the plaintiffs sincerely believe that invoking the accommodation facilitates and enables the provision of contraceptive services to their employees and students; the accommodation, in short, makes them eomplieit in the provision of services to which they possess a religious objection. That they need not pay for the services provides no relief from their religious dilemma, the district court reasoned, because they must violate their religious beliefs by either forgoing providing health insurance to their employees and students, or they must take critical steps (i.e. comply with the accommodation) to facilitate a third party’s provision of the objectionable coverage. Because failure to take either of these equally objectionable routes would result in the imposition of large financial penalties, the district court found that the plaintiffs demonstrated that the ACA imposes a substantial burden on their free exercise rights in contravention of the RFRA. The court then assumed that the government possessed a compelling interest in providing seamless contraceptive services to women in group health plans, but found that the accommodation was not the least restrictive means of accomplishing that goal. The court therefore enjoined the defendants from enforcing against the plaintiffs the requirements “to provide, pay for, or otherwise facilitate access to coverage for FDA approved contraceptive methods, abortion-inducing drugs, sterilization procedures, and related patient education and counseling.” Grace Schools, 988 F.Supp.2d at 958; Diocese of Fort-Wayne-South Bend, 988 F.Supp.2d at 980. The government appeals.
II.
Several months after the district court entered the injunctions for the plaintiffs here, we issued our opinion in Notre Dame I, where we affirmed the denial of a motion for a preliminary injunction under strikingly similar circumstances to those presented by these appeals. The government asserts that our decision in Notre Dame I controls the result here and requires that we reverse the preliminary injunctions granted by the district court. The plaintiffs argue that Notre Dame I is distinguishable and that application of the substantial burden test from Burwell v. Hobby Lobby Stores, Inc., — U.S.-, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014), and Korte requires that we affirm the preliminary injunctions here. After this appeal was fully briefed and argued, the Supreme Court vacated and remanded our opinion in Notre Dame I “for further consideration in light of Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014).” University of Notre Dame v. Burwell, — U.S.-, 135 S.Ct. 1528, 191 L.Ed.2d 557 (2015). We recently issued a new opinion addressing the effect of Hobby Lobby on Notre Dame’s appeal. See Notre Dame II, 786 F.3d at 615-19. We will begin our analysis with our original Notre Dame I opinion, which continues to apply to some of the questions raised here, before we turn to Notre Dame II. “We review the district court’s findings of fact for clear error, its balancing of the factors for a preliminary injunction under the abuse of discretion standard, and its legal conclusions de novo.” United Air Lines, Inc. v. Air Line Pilots Ass’n, Int’l, 563 F.3d 257, 269 (7th Cir.2009). To obtain a preliminary injunction, a party must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that issuing an injunction is in the public interest. Smith v. Executive Dir. of Ind. War Mem’ls Comm’n, 742 F.3d 282, 286 (7th Cir.2014).
*796 A.
In Notre Dame /, a non-profit Catholic university moved to enjoin the enforcement of the ACA’s contraception provisions against it. 743 F.3d at 551. Notre Dame provides health benefits to its employees and students. The university self-insures the employees and utilizes 'a third-party administrator to manage the plan. It contracts directly with an insurance provider for the student health plan. 743 F.3d at 549. The ACA requires the university, as an eligible organization, either to provide contraceptive coverage for its employees or to comply with the accommodation by opting out through the use of the EBSA Form 700 certification (“Form 700”), which we described above. 743 F.3d at 550. The relevant regulations required Notre Dame to provide the completed Form 700 to its third-party administrator and to the insurer of the student plan. Notre Dame filed suit shortly before the deadline for complying with the accommodation and moved for a preliminary injunction. The district court denied the motion and Notre Dame appealed, with fewer than two weeks left to meet the deadline for compliance. We denied the university’s motion for an injunction pending the appeal but ordered expedited briefing. On the last day to comply with the regulations, Notre Dame signed the Form 700 and supplied it to its insurer and third-party administrator. 743 F.3d at 551. The appeal proceeded.
We noted that Notre Dame’s primary objection was to the regulations surrounding the Form 700 certification. One regulation provides that:
the copy of the self-certification [EBSA Form 700] provided by the eligible [to opt out] organization [Notre Dame] to a third party administrator [Meritain] (including notice of the eligible organization’s refusal to administer or fund contraceptive benefits) ... shall be an instrument under which the plan is operated, [and] shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715-2713(a)(l)(iv) of this chapter to which the eligible organization objects on religious grounds.
Notre Dame I, 743 F.3d at 552-53 (quoting 29 C.F.R. § 2510.3-16). Notre Dame interpreted that regulation as if its mailing of the Form 700 to its insurer and its third-party administrator were the cause of the provision of contraceptive services to its employees and students, in violation of its religious beliefs. We noted that was not the case. Instead, the Form 700 allows the university to opt out of the provision of objectionable services entirely and the law then places the burden of providing the services on the insurer and the third-party administrator. 743 F.3d at 553.
In assessing the likelihood of Notre Dame’s success on the merits, we considered and rejected the school’s claim that filling out and mailing the Form 700 is a “substantial burden” on the university’s exercise of religion. 743 F.3d at 554. No-tre Dame complained that completing the form and distributing it to the insurer and third-party administrator triggered contraceptive coverage for employees and students, making the university complicit in the provision of objectionable services and burdening the university’s religious exercise. We found that The Form 700 self-certification does not trigger, cause or otherwise enable the provision of contraceptive services:
Federal law, not the religious organization’s signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contracep *797 tive services. By refusing to fill out the form Notre Dame would subject itself to penalties, but Aetna [the insurer] and Meritain [the third-party administrator] would still be required by federal law to provide the services to the university’s students and employees unless and until their contractual relation with Notre Dame terminated.
Notre Dame I, 743 F.3d at 554. We also rejected Notre Dame’s argument that its insurer and third-party administrator would not have been authorized as plan fiduciaries to provide the contraceptive services until the school executed Form 700. 743 F.3d at 554-55. The law and the regulations (and not the Form 700) designate the insurer and third-party administrator as plan fiduciaries who are then obligated by federal law to provide the contraceptive services. 743 F.3d at 555. We also concluded that the contraception regulations do not impose a substantial burden simply because the university must contract with a third party willing to provide (at the behest of the government) the services that Notre Dame finds objectionable. Because that third party did not object to providing the services, we called any such claim speculative and not a ground for equitable relief. We emphasized, in the end, that it was not the Form 700 or anything that Notre Dame was required to do by the regulatory accommodation that caused the university’s employees and students to receive the objectionable coverage; rather it was federal law that authorized, indeed required, insurers and third-party administrators to provide coverage. 743 F.3d at 559. Because the true objection was not to actions that the school itself was required to take but rather to the government’s independent actions in mandating contraceptive coverage, we concluded that there was no substantial burden on the university’s religious exercise. 743 F.3d at 559.
B.
As litigation on the ACA’s contraception requirements has progressed in other cases and other circuits, new regulations have been issued in response to interim orders from the Supreme Court. In Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Sebelius, — U.S. -, 134 S.Ct. 1022, 187 L.Ed.2d 867 (2014), after a district court declined to enjoin the operation of the ACA against a religious organization that did not wish to file the Form 700, the Court entered an injunction pending the appeal of that decision:
If the employer applicants inform the Secretary of Health and Human Services in writing that they are non-profit organizations that hold themselves out as religious and have religious objections to providing coverage for contraceptive services, the respondents are enjoined from enforcing against the applicants the challenged provisions of the Patient Protection and Affordable Care Act and related regulations pending final disposition of the appeal by the United States Court of Appeals for the Tenth Circuit. To meet the condition for injunction pending appeal, applicants need not use the form prescribed by the Government and need not send copies to third-party administrators. The Court issues this order based on all the circumstances of the case, and this order should not be construed as an expression of the Court’s views on the merits.
Little Sisters, 134 S.Ct. at 1022. The order, in short, relieved the Little Sisters of their obligation to file the Form 700 so long as they directly notified the government of their objection.
Subsequently, the Court entered a similar injunction in a case within our circuit. See Wheaton College v. Burwell, — U.S. -, 134 S.Ct. 2806, 189 L.Ed.2d 856 (2014). After essentially repeating the *798 language from the very short order in Little Sisters, the Court clarified:
Nothing in this interim order affects the ability of the applicant’s employees and students to obtain, without cost, the full range of FDA approved contraceptives. The Government contends that the applicant’s health insurance issuer and third-party administrator are required by federal law to provide full contraceptive coverage regardless whether the applicant completes EBSA Form 700. The applicant contends, by contrast, that the obligations of its health insurance issuer and third-party administrator are dependent on their receipt of notice that the applicant objects to the contraceptive coverage requirement. But the applicant has already notified the Government — without using EBSA Form 700— that it meets the requirements for exemption from the contraceptive coverage requirement on religious grounds. Nothing in this order precludes the Government from relying on this notice, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the Act.
Wheaton College, 134 S.Ct. at 2807. As with Little Sisters, the order relieved Wheaton College of its obligation to file Form 700 as long as it notified the government directly of its objection. But the government was permitted to use this direct notice to facilitate the coverage required by the ACA.
And finally, after the Third Circuit reversed a temporary injunction sought by a religious employer and granted by a district court, the Court again intervened:
The application for an order recalling and staying the issuance of the mandate of the Court of Appeals pending the filing and disposition of a petition for a writ of certiorari, having been submitted to Justice Alito and by him referred to the Court, the application as presented is denied. The Court furthermore orders: If the applicants ensure that the Secretary of Health and Human Services is in possession of all information necessary to verify applicants’ eligibility under 26 CFR § 54.9815-271SA(a) or 29 CFR § 2590.715-2713A(a) or 45 CFR § 147.131(b) (as applicable), the respondents are enjoined from enforcing against the applicants the challenged provisions of the Patient Protection and Affordable Care Act and related regulations pending final disposition of their petition for certiorari. Nothing in this interim order affects the ability of the applicants’ or their organizations’ employees to obtain, without cost, the full range of FDA approved contraceptives. Nor does this order preclude the Government from relying on the information provided by the applicants, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the Act. See Wheaton College v. Burwell, 573 U.S.-[134 S.Ct. 2806, 189 L.Ed.2d 856] (2014). This order should not be construed as an expression of the Court’s views on the merits. Ibid. Justice Sotomayor would deny the application.
Zubik v. Burwell, — U.S.-, 135 S.Ct. 2924, - L.Ed.2d - (2015) (full text found at http://www.supremecourt.gov/ seareh.aspx?filename=/docketfiles/14a 1065.htm, last visited September 3, 2015). As a result of these interim orders from the Supreme Court, the regulations have been amended so that objectors may now notify HHS directly rather than filing the Form 700. And the government may, in turn, facilitate the required contraceptive coverage based on such notice.
C.
We turn to our recent decisions in Notre Dame II and Wheaton College v. Burwell, 791 F.3d 792 (7th Cir.2015). In Notre *799 Dame II, we noted that, shortly after filing its suit and immediately before the regulatory deadline, the university signed the Form 700 and sent it to the insurer of its students and the third-party administrator of its employee plan. That action left us wondering what relief Notre Dame sought. Ultimately, we determined, Notre Dame wanted
us to enjoin the government from forbidding Notre Dame to bar Aetna and Mer-itain from providing contraceptive coverage to any of the university’s students or employees. Because of its contractual relations with the two companies, which continue to provide health insurance coverage and administration for medical services apart from contraception as a method of preventing pregnancy, Notre Dame claims to be complicit in the sin of contraception. It wants to dissolve that complicity by forbidding Aetna and Mer-itain — with both of which, to repeat, it continues to have contractual relations— to provide any contraceptive coverage to Notre Dame students or staff. The result would be that the students and staff currently lacking coverage other than from Aetna or Meritain would have to fend for themselves, seeking contraceptive coverage elsewhere in the health insurance market.
Notre Dame II, 786 F.3d at 611. The university’s primary objection to the ACA was that its contractual relationship with its insurer and third-party administrator made the school a conduit for the provision of objectionable services. According to Notre Dame, the contraception regulations imposed a substantial burden on it by forcing the university to identify and contract with a third party willing to provide objectionable contraceptive services. 786 F.3d at 611-12.
We noted that, although Notre Dame is the final arbiter of its religious beliefs, only the courts may determine whether the law actually forces the university to act in a way that would violate those beliefs. 786 F.3d at 612. The record contained no evidence to support a conduit theory. Nor is it within our usual practice to enjoin non-parties such as Notre Dame’s insurer and third-party administrator. We also rejected Notre Dame’s claim that the regulation requiring employers to provide Form 700 to its insurers was the cause of the provision of contraceptive services; rather the services are provided because federal law requires the insurers to provide them. Notre Dame II, 786 F.3d at 613-14 (“It is federal law, rather than the religious organization’s signing and mailing the form, that requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services.”). Because the insurer must provide the services no matter what the employer does, we noted that “signing the form simply shifts the financial burden from the university to the government, as desired by the university.” 786 F.3d at 615. See supra note 5. We thus re-asserted the core reasoning of our earlier opinion before turning to any effect that Hobby Lobby had on the case.
Hobby Lobby, we noted, involved closely-held for-profit corporations whose .owners objected on religious grounds to the contraceptive mandate. The Supreme Court held that the RFRA applied to nonreligious institutions owned by persons with sincerely held religious objections to the ACA’s contraception regulations. Hobby Lobby, 134 S.Ct. at 2776-78; Notre Dame II, 786 F.3d at 615. The Court noted that the companies’ objections could be addressed by allowing them to invoke the same accommodation that the government created for religious non-profit employers, namely signing and filing the Form 700. 134 S.Ct. at 2782. The Court left open the issue of whether the accommodation that was adequate for nonreligious, for-profit corporations would be suf *800 ficient to protect the rights of religious non-profit employers. As to that issue, we examined various alternative schemes that Notre Dame proposed as possible accommodations and found each of them lacking. We also noted that the Supreme Court had created an alternative to Form 700 by allowing employers to notify the government directly of its objection to the mandate. Notre Dame II, 786 F.3d at 617-18; Wheaton College, 134 S.Ct. at 2806. We rejected Notre Dame’s objections to the Wheaton College alternative notice, citing Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). We noted that the Roy Court rejected Roy’s religious objection to the government’s use of his daughter’s Social Security number for its purposes. The Court held “Roy may no more prevail on his religious objection to the Government’s use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government’s filing cabinets.” Roy, 476 U.S. at 700, 106 S.Ct. 2147. Notre Dame’s objection to the government designating insurers as substitutes to provide contraceptive coverage was an analogous challenge to the government’s management of its affairs and, accordingly, Notre Dame had not demonstrated a substantial burden to its religious exercise. Notre Dame II, 786 F.3d at 618.
In Wheaton College, we similarly rejected a religious school’s objections to the contraception regulations under the RFRA, the First Amendment and the Administrative Procedures Act. 791 F.3d at 801. The college asserted that the government was using the school’s insurance plan and putting additional terms into its contracts with insurers in order to provide the objectionable coverage. The college sought an injunction prohibiting the government’s effort to use Wheaton’s plans as the vehicle for making contraceptive coverage available to its employees and students. It objected to notifying its insurers or the government that it claimed a religious exemption, and also to providing the government with the names of its insurers so that the government could then implement the coverage separate from the college. We noted that the ACA and accompanying regulations do not alter any employer’s insurance plans or contracts. 791 F.3d at 794. Nor is the college being forced to allow the use of its plan to provide objectionable services. The ACA and regulations require only that the college notify either its insurers or the government that it objects, which takes the school out of the loop. 791 F.3d at 795. As in Notre Dame II, we rejected the claim that the provision of notice to insurers or the government somehow triggers or facilitates the provision of objectionable coverage. 791 F.3d at 796. As was the case with Notre Dame, Wheaton also objected to being forced to contract with insurers which, in turn, provided objectionable services, contending that this made the college complicit in the provision of those services. We saw no complicity in the operation of the law, which makes every effort to separate religious employers from the provision of any objectionable services.
We again noted that courts generally do not enjoin nonparties, and Wheaton had not made its insurers parties to the suit. Wheaton also expressed a reluctance to identify its insurers to the government, instead preferring that the government discover through its own research the names of the insurers. But Wheaton made no connection between the means for identifying the insurers and its religious commitments. We also noted Wheaton’s assertion that its students and employees sign a covenant agreeing to abide by the school’s moral standards, indicating perhaps that Wheaton’s concerns about the ACA are largely academic because the employees and students are unlikely to actually use the services offered. Finally, we *801 rejected Wheaton’s claims under the First Amendment, ERISA and the Administrative Procedures Act, all issues which were not argued in the instant appeal, and so we will not address them further. 791 F.3d at 797-800.
Before we move on to the plaintiffs’ objections in this case, we note that the case law analyzing the contraceptive mandate is rapidly evolving. Recently, the six other circuits to consider these same issues have all come to the same conclusion as our opinions in Notre Dame and Wheaton College, namely, that the contraceptive mandate, as modified by the accommodation, does not impose a substantial burden on religious organizations under the RFRA. See Catholic Health Care System v. Burwell, 796 F.3d 207, 216-26, 2015 WL 4665049, *7-*16 (2d Cir. Aug. 7, 2015) (concluding that the accommodation does not impose a substantial burden); Little Sisters of the Poor Home for the Aged v. Burwell, 794 F.3d 1151, 1173-74 (10th Cir.2015), petition for cert. filed, 84 USLW 3056 (U.S. July 24, 2015) (No. 15-105) (concluding that the mandate does not impose a substantial burden on religious exercise under RFRA and affirming the denial of a preliminary injunction in one instance and reversing the grant of preliminary injunctions in two others); East Texas Baptist University v. Burwell, 793 F.3d 449, 459 (5th Cir.2015), petition for cert. filed, 84 USLW 3050 (U.S. July 8, 2015) (No. 15-35) (holding that the ACA does not impose a substantial burden under the RFRA and reversing the grant of a preliminary injunction); Geneva College v. Secretary United States Department of Health & Human Servs., 778 F.3d 422, 442 (3d Cir.2015), petition for cert. filed, 83 USLW 3894 (U.S. May 29, 2015) (Nos. 14-1418 & 14A1065), and stay denied by Zubik v. Burwell, — U.S. -, 135 S.Ct. 2924, — L.Ed.2d - (2015) (reversing grant of preliminary injunction and concluding that the accommodation procedures do not impose a substantial burden on religious exercise); Priests for Life v. United States Dep’t of Health & Human Servs., 772 F.3d 229, 256 (D.C.Cir.2014), petition for cert. filed, 83 USLW 3918 (U.S. June 9, 2015) (No. 14-1453) (affirming denial of injunctive relief and concluding that the ACA’s mandate does not impose a substantial burden on religious exercise); Michigan Catholic Conference v. Burwell, 755 F.3d 372, 390 (6th Cir.2014), cert. granted, judgment vacated and remanded, — U.S. -, 135 S.Ct. 1914, 191 L.Ed.2d 760 (2015), reissued, — F.3d, 2015 WL 4979692 (6th Cir. Aug. 21, 2015) (because objectors may obtain the accommodation from the contraceptive-coverage requirement without providing, paying for, and/or facilitating access to contraception, the contraceptive-coverage requirement does not impose a substantial burden on their exercise of religion).[10] No court of appeals has concluded that the contraceptive mandate imposes a substantial burden under the RFRA.
D.
After this court issued its opinion in Notre Dame II, we asked the parties to file position statements addressing the ef- *802 feet of that opinion on this appeal. We turn now to the parties’ position statements as well as the arguments raised in their original briefs. The government, in its original brief, contended that Notre Dame I was controlling. It argued that the plaintiffs are permitted to opt out of providing contraceptive coverage, and that the plaintiffs improperly object to requirements imposed by the accommodation on third parties rather than on themselves. The government also asserted that it is the province of the court rather than the plaintiffs to determine whether a particular regulation or law “substantially” burdens the plaintiffs’ free exercise of religion um der the RFRA. Finally, the government maintained that, even if we were to determine that the regulations impose a substantial burden on the plaintiffs under the RFRA, the government’s interest in providing the coverage is compelling and the regulations are narrowly tailored to meet that interest.
In its position statement, the government adds that Notre Dame II rejected all of the arguments raised by the plaintiffs here. Specifically, the government again notes that the regulations allow the plaintiffs to opt out of providing the mandated contraceptive services, making them effectively exempt. After objectors opt out, the government tasks third parties with providing the coverage. Moreover, the opt-out does not operate as a trigger or cause for the coverage; rather federal law imposes on third parties the obligation to provide the coverage. Nothing in the ACA or regulations makes the plaintiffs complicit or allows their contracts with insurers or third party administrators to act as conduits for the provision of contraceptive services. The government repeats that, even if the regulations impose a substantial burden on the plaintiffs’ free exercise of religion under the RFRA, the regulations serve a compelling government interest and are the least restrictive means of achieving those interests. According to the government, our opinion in Notre Dame II demonstrates that the current regulations are narrowly tailored to achieve the compelling interest, and that none of the plaintiffs’ suggested alternatives would be effective.
In their opening brief, the plaintiffs argued, as they did below, that the contraception regulations impose a substantial burden on their exercise of religion. The plaintiffs asserted that they exercise their religion “by refusing to take actions in furtherance of a regulatory scheme to provide their employees with access to abortion-inducing products, contraceptives, sterilization, and related education and counseling.” Brief at 29. The plaintiffs maintained that submitting Form 700 renders them complicit in a grave moral wrong because the form has certain legal effects that facilitate the provision of the objectionable services. The accommodation, the plaintiffs added, requires them to amend the documents governing their health plans to provide the very coverage to which they object. The plaintiffs also objected to contracting with and paying premiums to insurance companies or third party administrators that are authorized to provide their employees with contraceptive coverage. Moreover, the plaintiffs pointed out that if they fail to comply with the regulations, they will face onerous fines. The plaintiffs asserted that Notre Dame I is distinguishable on the facts, and that Notre Dame I did not address the arguments of the Catholic appellees here that (1) the Diocese is being forced to forgo $200,000 annually in increased premiums in order to maintain its grandfathered status [11] to avoid its plan becoming a conduit *803 for objectionable coverage for the employees of Catholic Charities that are enrolled in the Diocese’s health plan; and (2) the mandate has the additional effect of artificially dividing the Catholic Church into a “worship arm” and a “good works arm.”
The plaintiffs also maintained in their opening brief that the government’s “substantial burden” analysis incorrectly focuses on the nature of the actions that the regulations require the plaintiffs to take rather than the pressure the government has placed on the plaintiffs to take those actions. They contended that the focus of the analysis should be on the intensity of the coercion applied by the government to act contrary to their religious beliefs. Finally, they asserted that they object to actions they themselves must take under the regulations, not to the actions of third parties.
In their position statement, the plaintiffs contend that Notre Dame II is distinguishable on the facts, that it is not binding here, and that it is based on legal errors. Finally, the plaintiffs argue that the strict scrutiny analysis in Notre Dame II is both foreclosed by the government’s concession in this case and inconsistent with circuit precedent.
E.
We turn to the specific objections raised by the plaintiffs here. They contend that the accommodation does not operate as a true “opt-out” because it requires them to engage in numerous religiously objectionable actions. The actions to which the plaintiffs object fall under two categories: first, the mandate requires them to contract with insurance companies or third-party administrators that are authorized to provide the objectionable coverage and which will provide that coverage once the plaintiffs communicate their objections. Second, they must submit the Form 700 or notify the government directly of their objection. They sincerely believe that the required actions render them complicit in a grave moral wrong because their insurance contracts serve as conduits for the provision of the objectionable services, and the notification triggers or facilitates the provision of objectionable services. They practice their religion, they assert, by refusing to take actions “in furtherance of’ a scheme to provide the objectionable services. And if they decline to engage in these actions, the mandate subjects them to onerous fines.
The core of the disagreement between the plaintiffs and the government lies in how we apply the substantial burden test. The plaintiffs cite our decision in Korte for the proposition that the substantial burden test under the RFRA focuses primarily on the intensity of the coercion applied by the government to act contrary to religious beliefs. Korte, 735 F.3d at 683. Citing Hobby Lobby, they also assert that the RFRA allows private religious believers to decide for themselves whether taking a particular action (such as filing the Form 700 or contracting with an insurance company) is connected to objectionable conduct in a way that is sufficient to make it immoral. Hobby Lobby, 134 S.Ct. at 2778.
In Korte, we noted that “exercise of religion” means “any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” 735 F.3d at 682; 42 U.S.C. § 2000cc-5(7)(A). A substantial burden on free exercise may arise when the government compels a religious person to perform acts undeniably at odds *804 with fundamental tenets of that person’s religious beliefs, and also when the government places substantial pressure on a person to modify his or her behavior in a way that violates religious beliefs. Korte, 735 F.3d at 682. “Put another way, the substantial-burden' inquiry evaluates the coercive effect of the governmental pressure on the adherent’s religious practice and steers well clear of deciding religious questions.” Korte, 735 F.3d at 683. Relying on Korte and Hobby Lobby, the plaintiffs urge us to engage in a two-step analysis of first identifying the religious belief at issue, and second, determining whether the government has placed substantial pressure on the plaintiffs to violate that belief.
The plaintiffs are correct that it is not our province to decide religious questions. Hobby Lobby, 134 S.Ct. at 2778 (the RFRA presents the question of whether the mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with their religious beliefs, but courts have no business addressing whether the religious belief asserted is reasonable); Notre Dame II, 786 F.3d at 612 (an objector is the final arbiter of its religious beliefs); Little Sisters of the Poor, 794 F.3d at 1177-78 (substantiality does not permit a court to scrutinize the theological merit of a plaintiffs religious beliefs); Geneva College, 778 F.3d at 436 (courts should defer to the reasonableness of a plaintiffs religious beliefs). The plaintiffs in Hobby Lobby were closely-held, for-profit corporations that were required by the ACA to provide and pay for health insurance which included coverage of certain emergency contraceptives that they believed operated as abortifacients. Similar to the plaintiffs here, they believed that providing the required coverage is connected to the destruction of an embryo in a way that is sufficient to make it immoral for them to provide the coverage. “This belief implicates a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another.” Hobby Lobby, 134 S.Ct. at 2778.
So we defer to the plaintiffs’ sincerely held beliefs regarding questions of religion and moral philosophy. But whether the government has imposed a substantial burden on their religious exercise is a legal determination. Notre Dame II, 786 F.3d at 612; Little Sisters of the Poor, 794 F.3d at 1175-77; East Texas Baptist University, 793 F.3d at 456-59 & n. 33; Geneva College, 778 F.3d at 436; Priests for Life, 772 F.3d at 247-49; Michigan Catholic, 755 F.3d at 385. And we are not required to defer to the plaintiffs’ beliefs about the operation of the law. Notre Dame II, 786 F.3d at 612 (although an objector is the final arbiter of its religious beliefs, it is for the courts to determine whether the law actually forces the objector to act in a way that would violate those beliefs); Little Sisters of the Poor, 794 F.3d at 1175-77 (courts need not accept the legal conclusion, cast as a factual allegation, that a plaintiffs religious exercise is substantially burdened); Geneva College, 778 F.3d at 436 (courts need not accept an objector’s characterization of a regulatory scheme on its face but may consider the nature of the action required of the objector, the connection between that action and the objector’s beliefs, and the extent to which that action interferes with or otherwise affects the objector’s exercise of religion, all without delving into the objector’s beliefs); Michigan Catholic, 755 F.3d at 385 (although a court may acknowledge that the objectors believe that the regulatory framework makes them complicit in the provision of contraception, the court will independently *805 determine what the regulatory provisions require and whether they impose a substantial burden on the objector’s exercise of religion). In this instance, and as was the case in Notre Dame I and II, the plaintiffs misapprehend the operation of federal law. As many courts have noted, contraceptive coverage under the ACA results from federal law, not from any actions required by objectors under the accommodations. Notre Dame II, 786 F.3d at 614; and 786 F.3d at 623 (Hamilton, J., concurring); Little Sisters of the Poor, 794 F.3d at 1173-74; East Texas Baptist, 793 F.3d at 459; Geneva College, 778 F.3d at 437; Michigan Catholic, 755 F.3d at 387.
The first action to which the plaintiffs object is filing the Form 700. They assert that the Form 700 is far more than a simple notification or objection, that it instead (1) designates the third party administrator as plan administrator and claims administrator for contraceptive benefits; (2) serves as an instrument under which the plans are operated vis-á-vis contraceptive services; and (3) apprises the third party administrator of its obligations to provide contraceptive coverage. We rejected this very argument in Notre Dame II, holding that treating the mailing of the Form 700 as the cause of the provision of contraceptive services is legally incorrect. 786 F.3d at 613. The Form 700, we noted, has the effect of throwing the entire administrative and financial burden of providing contraception on the insurer and the third party administrator. 786 F.3d at 613-14. As a result, the burden is lifted from the objector’s shoulders. 786 F.3d at 614. “It is federal law, rather than the religious organization’s signing and mailing the form, that requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services.” 786 F.3d at 614. See also Little Sisters of the Poor, 794 F.3d at 1173-74 & 1180-85 (finding that plaintiffs do not “trigger” or otherwise cause contraceptive coverage because federal law, not the act of opting out, entitles plan participants and beneficiaries to coverage); Geneva College, 778 F.3d at 437-38 (same); Michigan Catholic, 755 F.3d at 387 (same).
Moreover, the regulations have been amended during this litigation, and now employers need not file the Form 700. Instead, consistent with the Supreme Court’s interim orders in Little Sisters of the Poor and Wheaton College, the plaintiffs may contact the Department of Health and Human Services directly, alerting the government that they have a religious objection to providing contraceptive coverage, and providing only the name and contact information for their insurers or third party administrators. 80 Fed.Reg. 41342-47 (July 14, 2015). The burden then falls on the government to make appropriate arrangements with the insurer or third-party administrator to provide coverage for contraceptive services. The plaintiffs object to that action as well, asserting that it also makes them complicit in the provision of coverage. But that notification does nothing more than completely remove an objector from the provision of the objectionable services. See Geneva College, 778 F.3d at 436 (“While the Supreme Court reinforced in Hobby Lobby that we should defer to the reasonableness of the appellees’ religious beliefs, this does not bar our objective evaluation of the nature of the claimed burden and the substantiality of that burden on the appellees’ religious exercise.”). As we noted in our Notre Dame opinions, the plaintiffs are in the strange position of objecting not to the contraceptive mandate itself but to the accommodation that relieves them of any involvement in the implementation of the contraceptive mandate. Notre Dame I, 743 F.3d at 557-58; Notre Dame II, 786 F.3d at 621 (Hamilton, J., concurring). See also Little Sisters of the Poor Home for the Aged v. Burwell, 794 F.3d 1151, *806 1171-73 (10th Cir.2015) (noting the unusual nature of a claim that attacks the government’s attempt to accommodate religious exercise by providing a means to opt out of compliance with a generally applicable law).
[T]he arrangements the government makes to find substitutes for those given the benefit of a religious exemption are imposed as a matter of federal law, not as a result of the exemption itself. The party claiming the exemption is not entitled to raise a religious objection to the arrangements the government makes for a substitute.
Notre Dame II, 786 F.3d at 623 (Hamilton, J., concurring). In short, requiring an employer to notify the government of its objection to the mandate is no more burdensome than the government’s use of a girl’s Social Security number in a benefits program even though her father sincerely believed that the use of the number would harm his daughter’s spirit. See Notre Dame II, 786 F.3d at 618-19 (discussing Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986)). So too with the plaintiffs here.
The second action to which the plaintiffs object is contracting with insurers and third-party administrators who will then provide the objectionable coverage, albeit at no cost to, and without further involvement of, the plaintiffs. The plaintiffs admittedly want to provide their employees and students with health insurance; indeed they have said that it is part of their religious mission to do so. But they wish to provide health insurance without the objectionable coverage. Yet this is exactly what the accommodation allows them to do. Notre Dame II, 786 F.3d at 621-22 (Hamilton, J., concurring) (once an employer files the Form 700 or notifies the government directly of its religious objection, it can avoid contracting, paying, arranging, or referring for the objectionable contraceptive care); Wheaton College, 791 F.3d at 795-96 (once the college notifies its insurer or the government of its religious objections, the college and its health plans are bypassed). As with the notification requirement, the plaintiffs believe that their contracts further the provision of objectionable services. They assert that the government is using their health plans or altering the terms of their health plans to provide contraceptive coverage. But once they have objected, the government does not use the health plans or contracts at all, much less alter any terms. See Wheaton College, 791 F.3d at 796 (“Call this ‘using’ the health plans? We call it refusing to use the health plans.”). As we noted in Wheaton College:
The upshot is that the college contracts with health insurers for contraceptive coverage exclusive of coverage for emergency contraceptives, and the Department of Health and Human Services contracts with those insurers to cover emergency-contraceptive benefits. The latter contracts are not part of the college’s health plans, and so the college is mistaken when it tells us that the government is “interfering” with the college’s contracts with its insurers. The contracts, which do not require coverage of emergency contraception, are unchanged. New contracts are created, to which the college is not a party, between the government and the insurers.
Wheaton College, 791 F.3d at 796. We rejected any notion of complicity in the provision of contraceptive services arising from the mere existence of a contract to provide health insurance without any contraceptive coverage. 791 F.3d at 797. See also Little Sisters of the Poor, 794 F.3d at 1173-74 (the de minimis administrative tasks required to opt out of the mandate relieves objectors from complicity); East Texas Baptist, 793 F.3d at 461 (“Under the accommodation, the contracts are sole *807 ly for services to which the plaintiffs do not object; the contracts do not provide for the insurers and third-party administrators to cover contraceptives, do not make it easier for those entities to pay for contraceptives, and do not imply endorsement of contraceptives.”).
To the extent that the act of opting out causes the legal responsibility to provide contraceptive coverage to shift from the plaintiffs to their insurers or third-party administrators, this feature relieves rather than burdens their religious exercise. Little Sisters of the Poor, 794 F.3d at 1173-74. As our colleagues in the Tenth Circuit noted, “An opt out religious accommodation typically contemplates that a non-objector will replace the religious objector and take over any legal responsibilities.” Little Sisters of the Poor, 794 F.3d at 1174 n. 21; East Texas Baptist, 793 F.3d at 461-62 (RFRA does not entitle plaintiffs to block third parties such as the government or insurers from engaging in conduct with which the plaintiffs disagree); Geneva College, 778 F.3d at 438 n. 13 (the provision of contraceptive coverage is not dependent upon the objector’s contract with its insurance company); Michigan Catholic, 755 F.3d at 388 (the government’s imposition of an independent obligation on a third party does not impose a substantial burden on an objector’s exercise of religion).
Finally, the Catholic plaintiffs here (namely, the Diocese, Catholic Charities, St. Anne Home, Franciscan Alliance, Specialty Physicians, St. Francis and Sunday Visitor) assert what they characterize as unique RFRA claims that were not presented in the Notre Dame appeal and therefore are not resolved by the Notre Dame opinions. In particular, they argue that the mandate substantially burdens the Diocese’s religious exercise by forcing it to forgo almost $200,000 annually in increased premiums to maintain its grandfathered status so that it may avoid its health plan becoming a conduit for objectionable coverage for Catholic Charities’ employees who are enrolled in its health plan. See note 11 supra. But if the Diocese were to lose its grandfathered status, it would become exempt from the ACA’s contraceptive mandate, and Catholic Charities would be able to opt out of the mandate by employing the accommodation. As we just concluded, that scenario would not impose a substantial burden on the free exercise rights of either the Diocese or Catholic Charities.
The Catholic plaintiffs also contend that the mandate has the effect of artificially dividing the Catholic Church into a “worship” arm (the Diocese) and a “good works” arm (the remaining Catholic plaintiffs). Again, though, groups affiliated with the Diocese may opt out of providing contraceptive coverage using the accommodation and thus continue to provide health coverage under the Diocese’s health plan. Both arms of the Church are therefore extricated from the provision of objectionable contraceptive services, albeit through different means. Moreover, any division is created not by the ACA but by the Internal Revenue Code that excepts “churches, their integrated auxiliaries, and conventions or associations of churches” from certain requirements. See 26 U.S.C. § 6033(a)(3)(A)(i). It is difficult to see how laws and regulations that grant tax advantages to churches and their integrated auxiliaries somehow impose a substantial burden on affiliates.
III.
The accommodation does not serve as a trigger or a conduit for the provision of contraceptive services. Notre Dame II, 786 F.3d at 612-15; Wheaton College, 791 F.3d at 795-97. It is the operation of federal law, not any actions that the plain *808 tiffs must take, that causes the provisions of services that the plaintiffs find morally objectionable. The accommodation has the legal effect of removing from objectors any connection to the provision of contraceptive services. As we noted above, every other circuit court to consider the issue of whether the mandate imposes a substantial burden on religious exercise has come to the same conclusion. As a result, the plaintiffs are not entitled to a preliminary injunction against the enforcement of the ACA regulations. If they wish to object, they may either employ the Form 700 or they may notify the Department of Health and Human Services directly. We extend the injunctions here for 60 days so that the district court may consider in the first instance the additional arguments that plaintiffs raised in support of injunctive relief. We reverse the district court’s judgments and remand for proceedings consistent with this opinion.
REVERSED AND REMANDED.

. All three of these regulations have been amended since this suit was filed. The most recent amendments, which are scheduled to take effect Sept. 14, 2015, address accommodations for closely-held for-profit corporations whose owners have religious objections to some or all of the contraceptive coverage requirements of the ACA. See Burwell v. Hobby Lobby, - U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). Because these most recent amendments are not relevant to the issues raised here, we will be referring to the version of the regulations in effect at the time this suit was filed, unless we state otherwise.

. This regulation will also be updated as of Sept. 14, 2015: Again, we cite to the earlier version.

. The form can be found at http://www.dol. gov/ebsa/pdi/preventiveserviceselig ibleorganizationcertificationform.pdf, last visited September 3, 2015.

. From this point forward, when we use the term "insurer,” we mean to include third-party administrators in those instances where the plan is self-insured unless we state otherwise.

. Insurers are expected to recoup the costs of contraceptive coverage from savings on pregnancy medical care as well as from other regulatory offsets. See Notre Dame II, 786 F.3d at 609-10; 78 Fed.Reg. 38977-78 ("Issuers are prohibited from charging any premium, fee, or other charge to eligible organizations or their plans, or to plan participants or beneficiaries, for making payments for contraceptive services, and must segregate the premium revenue collected from eligible organizations from the monies they use to make such payments. In making such payments, the issuer must ensure that it does not use any premiums collected from eligible organizations."). Third-party administrators may seek reimbursement of up to 110% of their costs from the government. Notre Dame II, 786 F.3d at 609; 45 C.F.R. § 156.50(d)(3).

. The plaintiffs also allege that the challenged statute and regulations violate their rights under the First Amendment and under the Administrative Procedures Act, 5 U.S.C. § 500 et seq. Because the district court issued the injunction after considering only the RFRA, and because neither side has briefed the other issues, we will confine our discussion to the RFRA. On remand, the plaintiffs are free to pursue their other theories for relief and, in fact, we will leave the injunction in place for a limited time in order to allow the court to consider those additional claims.

. The disputed regulations apply equally to employers providing insurance to employees and to institutions of higher education providing student health insurance. See 45 C.F.R. § 147.131(f). Some of the plaintiffs provide both employee and student health coverage.

. When calculating the number of employees for the purpose of assessing this penalty, the statute directs that thirty employees be subtracted from the total number of employees, essentially reducing the penalty by $60,000 *794 per year for affected employers. 26 U.S.C. § 4980H(c)(2)(D)(i).

. Although the Diocese is itself exempt, the Diocesan Health Plan insures employees of the non-exempt Catholic Charities. In order to protect Catholic Charities from having to comply with either the contraceptive mandate or the accommodation, the Diocese has forgone almost $200,000 annually in increased premiums in order to maintain its grandfathered status under the ACA. See 42 U.S.C. § 18011. Grandfathered plans are those health plans that need not comply with the coverage requirements of the ACA because they were in existence when the ACA was adopted and have not made certain changes to the terms of their plans.

. The Sixth Circuit released its opinion a few weeks prior to the issuance of Hobby Lobby, but denied rehearing en banc several months later. The Supreme Court subsequently granted the petition for certiorari, vacated the opinion and remanded for further consideration in light of Hobby Lobby. The Sixth Circuit recently reissued and reaffirmed its earlier opinion and filed a supplemental opinion addressing Hobby Lobby. The Sixth Circuit continues to hold that the ACA’s contraception provisions do not impose a substantial burden under RFRA. Michigan Catholic, - F.3d at-, 2015 WL 4979692, *6-*15.

. "Grandfathered plans" are plans that were in existence when the ACA was adopted and that have not made certain changes to the terms of the plans. Grandfathered plans need *803 not comply with the ACA’s coverage requirements. See 42 U.S.C. § 18011; 26 C.F.R. § 54.9815-1251T. Certain increases in premi-urns could cause a plan to lose its grandfathered status and thus become subject to the ACA's coverage requirements.