TJOFLAT, Circuit Judge,
dissenting:
I diverge from the majority on the question of whether the Religious Freedom Restoration Act (“RFRA”), 42 U.S.C. § 2000bb et seq., shields Eternal Word Television Network and the Archdiocese of Atlanta, the Diocese of Savannah, and their related schools and charities (the “Dioceses”) from the Government’s efforts to force them to participate in a complicated regulatory scheme. Doing so, these parties sincerely believe, would make them complicit in violating the sanctity of human life. ’ As I understand RFRA’s plain meaning and the controlling precedent, on full display in the Supreme Court’s decision in Burwell v. Hobby Lobby Stores, Inc., 573 U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014), the answer should be straightforward. Under RFRA’s demanding scrutiny, the Government cannot put religious believers to the choice of abandoning the commands of their faith or paying massive penalties unless it can show that it has no other way of achieving a compelling interest. Just as in Hobby Lobby, the Govern *1170 ment has failed to make this showing, -We are therefore bound. to grant Eternal Word Television Network and the Dioceses the relief they seek.
“Great cases, like hard cases, make bad law.” N. Sec. Co. v. United States, 193 U.S. 197, 364, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904) (Holmes, J., dissenting). In such circumstances, practical concerns “exercise a kind of hydraulic pressure” under which “even well settled principles of law will bend” as a result of “some accident of immediate overwhelming interest.” Id. at 364, 401, 24 S.Ct. at 468. In the background of. this litigation rage many competing interests: What sort of legal regime would best preserve the American ideal of religious liberty? How can we most effectively . expand healthcare access? When and where should the interests of society trump those of the individual? Who will be left holding the check for any newly minted social-welfare programs?
It is Congress’s responsibility — not the prerogative of courts — to balance these interests. And Congress made clear in RFRA how that balance is to be struck: the freedom of religious exercise is to be jealously guarded by subjecting, across the board, Congress’s own actions to the most rigorous scrutiny. Under that scrutiny, the Government’s attempt here to burden Eternal Word Television Network and the Dioceses’ religious exercise must give way. Concluding otherwise, the majority makes bad law. For that reason, I dissent.
I.
The devil, as they say, is in the details. Nowhere does this adage ring truer than in the administrative morass of the ■ so-called “accommodation,” the regulatory mechanism by which religiously objecting employers can affirmatively opt out of the Affordable Care Act’s so-called “contraceptive mandate.” The resolution of this case turns on the exact functioning of an evolving set of overlapping and intricate regulations promulgated by three Executive-branch agencies. These regulations overlay a particularly unsettled and murky region of the generally unsettled and murky ■landscape of federal healthcare regulation. Therefore, it is critical to get the details right. And they are devilish indeed.
A.
Under the Patient Protection and Affordable Care Act of 2010 (“the ACA”), covered employers, as part of their “[sjhared responsibility” for their employees’ healthcare needs, are required to provide qualifying employees with health plans that meet certain standards of “minimum essential coverage.” 26 U.S.C. §§ 4980H(a), 5000A(f)(2). Covered employers who fail to do so have to pay a “tax”[1] of $100 per day for each affected employee. Id. § 4980D(a)-(b). For continued “noncompliance” after receiving a “notice of examination,” employers are subject to a minimum penalty in the amount of $2,500 or $15,000 per affected employee, depending on whether the violations “are more than de minimis.” Id. § 4980D(b)(3).
Included in the ACA’s definition of “minimum essential coverage” are a number of preventive healthcare services. Relevant here is the requirement to provide “with respect to women, such additional preventive care and screenings ... as provided for in comprehensive guidelines supported by the Health Resources and Services Administration.” 42’ U.S.C. § 300gg-13(4). To develop these guidelines, the Health Resources and Services Administration, a subpart *1171 of the Department, of Health and Human Services, sought recommendations from the Institute of Medicine, a division of the National Academies of Sciences. The Institute of Medicine’s .recommendations[2] were ¡ultimately adopted in identical regulations promulgated by the Department of Treasury, the Department of Labor, and the Department of Health and Human Services. See 26 C.F.R. § 54.9815-2713(a)(1)(iv); 29 C.F.R. § 2590.715 — 2713(a)(1)(iv); 45 C.F.R. § 147.130(a)(l)(iv).[3] As a result, nonexempt employers are responsible for providing their plan beneficiaries with coverage for “[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.” Women’s Preventive Services Guidelines, U.S. Dep’t of Health and Human Servs., Health Res. and Sérvs. Admin., http:// hrsa.gov/womensguidelines/ (last visited Feb. 10, 2016).
These regulations, collectively known as the “contraceptive mandate,” did not apply as enacted to several categories of employers. As is true generally of the ACA the contraceptive mandate does not cover employers with less than fifty full-time employees.. See 26 U.S.C. § 4980H(a), (e)(2). These employers are thus under no obligation to provide any health plan at all. Similarly, employers who maintain “grandfathered health plans” — health plans that have not undergone specified changes in the way they operated before March 23, 2010, see 75 ,Fed.Reg. 34538, 34540-41— are specifically exempted from the contraceptive mandate. 42 U.S.C. § 18011(a), (e). Other changes instituted by the ACA do apply to grandfathered health plans, including extensions of dependent coverage for adult children under the age of twenty-six and prohibitions on excessive waiting periods/ lifetime benefits limits, and rescissions of coverage. Id. § 18011(a)(4)(A)(i)-(iv). The ACA does-not include a sunset provision for grandfathered • health plans, which can continue their exempt status indefinitely.[4]
Conscious of the bind in which the contraceptive mandate would place certain employers with religious objections, the Departments promulgated a series of further regulations to exempt these employers as well.[5] What emerged from several *1172 years' of rulemaking were two distinct regimes for employers with religious objections: one for “religious employers” and another for “eligible organizations.” ”45 C.F.R. § 147.131(a), (b). “Religious employers” are defined, by reference to the Internal Revenue Code, as “churches, their integrated auxiliaries, and conventions or associations of'.churches” and' any “nonprofit entities]” engaged in “the exclusively religious activities of any religious order.” Id. § 147.131(a); 26 U.S.C. § 6033(a)(3)(A)(i), (iii).[6] Employers who object to the contraceptive mandate but are not considered “religious employers” can still qualify as “eligible organizations” if they meet the following requirements:
(1)The organization opposes providing coverage for some or all of any contra-
ceptive items or services required to be covered under § 147.130(a)(l)(iv) on account of religious objections.
(2) (i) The organization is organized and ' operates as a nonprofit entity and holds itself out as a religious organization; or
( (ii) The organization is organized and operates as a closely held for-profit entity ... that ... objects to covering some or all of the contraceptive services on account of the owners’ sincerely held religious beliefs.
(3) The organization must self-certify in the form and manner specified by the , Secretary of Labor or provide notice to the Secretary of Health and Human Services as described [elsewhere in the regulations] ...
45 C.F.R. § 147.131.[7]
*1173 Religious employers’ and eligible organizations’ bids to remove themselves from the contraceptive mandate fare differently. Religious employers .are simply exempt; they are not required to participate, directly or indirectly, in providing access to contraceptive coverage to their female employees and beneficiaries, whether or not these women share their employers’ beliefs. 45 C.F.R. § 147.131(a). Eligible organizations, in contrast, are required to affirmatively opt out of providing contraceptive coverage, if they wish to do so, by complying with a further series of regulations known as “the accommodation.” Id. § 147.131(c).
How the accommodation functions turps on the eligible organization’s type of health plan. Broadly speaking, employer-sponsored health plans come in two types: insured plans and self-insured plans. Under an insured plan, the employer enters into a contract with an insurer. The insurer, in exchange for up-front premiums, becomes responsible for administering the plan and paying out claims., Under a self-insured plan, the employer remains responsible for paying its employees’ claims itself; in essence, the employer serves as its own insurer. For employers with self-insured plans, it is a common practice to contract with a third-party administrator — -which may also be in the business of providing insured, plans — to administer the self-insured plany though the employer continues to bear the cost of paying claims.[8] Eligible organizations that maintain their own self-insured plans without a third-party administrator are, like religious employers, exempt from the contraceptive mandate altogether. ,
" Eligible organizations may, in line with the -regulations currently in force, avail themselves of the accommodation in one of two ways.[9] The first option -is to send a “self-certification” form, Employee Benefits Security Administration Form 700 (“Form 700”), to the eligible organization’s insurer, if the organization has- an insured plan, or to the organization’s third-party administrator, if the. organization has a self-insured ' plan. 45 C.F.R, § 147.131(b)(3), (c)(1), Form 700 requires eligible organizations to identify themselves as qualifying for the accommodation; -list the name, title, and contact information of the pérson authorized to make that certification;, and sign and date the form.[10] The second option is to send to the Secretary- of Health and Human Services less-formal notice of the eligible organization’s intent >to opt out. That notice must include “the- name of the eligible organization and -the basis on which it qualifies for an accommodation,” notice of its objection- to the contraceptive mandate *1174 “based on [the eligible organization’s] sincerely held religious beliefs,” the name and type of the eligible organization’s health plan, and the identity and contact information of the eligible organization’s insúrer or third-party administrator. ■ ■ Id. § 147.131(c)(l)(ii).
Under the first option provided for in the accommodation, whereby Form 700 is sent directly to an eligible organization’s insurer or third-party administrator, the recipient insurer or third-party administrator becomes responsible for establishing separate contraceptive coverage for the eligible organization’s female employees and plan beneficiaries. The insurer or third-party administrator must, upon receipt of the eligible organization’s Form 700, “[e]x-pressly exclude contraceptive coverage” from the eligible organization’s plan and “[p]rovide separate payments for any contraceptive services required to be covered” pursuant to the contraceptive mandate. Id. § 147.131(c)(2)(i)(A)-(B). Among other requirements, the insurer or third-party administrator must also “segregate premium revenue ... from the monies used to provide payments for contraceptive services” and is forbidden from “imposing] any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing] any .premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.” Id. § 147.131(c)(2)(ii). And the insurer or third-party administrator must provide to plan members and beneficiaries written notice outlining how the accommodation works and “specifying] that the eligible organization does not administer or fund contraceptive benefits.” See id. § 147.131(d) (proposing suggested language for this notice).
Under the second option provided for in the accommodation, whereby less-formal notice is sent instead to the Secretary of Health and Human Services, the Secretary is then tasked with alerting the eligible organization’s insurer or third-party administrator. The Department of Health and Human Services will “send a separate notification” to the insurer relaying that the eligible organization’s notice was received and “describing the [insurer’s or third-party administrator’s] obligations.” 45 C.F.R. § 147.131(c)(1)(h). The insurer’s or third-party administrator’s obligations to provide separate coverage pursuant to the contraceptive mandate are identical whether it is alerted to the eligible organization’s objections directly by Form 700 or indirectly by the Government.[11]
The regulations require eligible organizations to affirmatively opt out of the contraceptive mandate because .doing so enables the Government to require the eligible organizations’ insurers and third-party administrators to provide contraceptive coverage. For eligible organizations with insured plans,[12]- opting out under the accommodation notifies the in *1175 surers of their obligations to provide contraceptive coverage. 45 C.F.R. § 147.131(c)(2)(i). For eligible organizations with self-insured plans that contract with a third-party administrator,[13] opting out of the contraceptive mandate under the accommodation makes the third-party administrator “the plan administrator” ' for purposes of the Employee Retirement Income Security Act (“ERISA”), 29 U.S.C. § 1001 et seq., under regulations promulgated by the Department of Labor. 29 C.F.R. § 2510.3-16(b). If the eligible organization submits Form 700, that submission “shall be treated as a designation' of the third party administrator as the' plan administrator.” Id. If the eligible organization instead provides less-formal notice to the Secretary of Health and Human Services, “the Department of Labor, working with the Department of Health and Human Services, shall ... provide notification ... that such third party administrator shall be the plan administrator” under ERISA. Id. Once a third-party administrator becomes a “plan administrator” under ERISA, the relevant administrative agencies gain the regulatory authority ■ to . require the third-party administrator to provide contraceptive coverage.[14] Id. § 2510.3-16(c).
The Government’s regulatory authority to require ■ third-party administrators of self-insured plans to provide contraceptive coverage is limited. A third-party administrator may always decline to “agree[ ] to enter into or remain in a contractual relationship with the eligible organization.”[15] 26 C.F.R. § 54.9815-2713A(b)(2). Only if it accepts the terms of the regulations does a third-party administrator incur the obligation “to provide or arrange payments for contraceptive services.” Id. § 54.9815-2713A(d). .If a third-party administrator agrees to provide the. contraceptive coverage, the costs it incurs to do so will be reimbursed from “Federally-facilitated Exchange” user fees, which are fees imposed on insurers offering health plans on exchanges established by the Government under the ACA.[16] See 80 Fed. Reg. at 41328.
*1176 B.
Inextricably intertwined with these evolving regulations is - a series of cases challenging the various iterations of the contraceptive mandate under the Religious Freedom Restoration Act (“RFRA”), 42 U.S.C. § 2000bb et seq. RFRA provides that the federal government[17] “may substantially burden a person’s exercise of religion” only if it does so “in furtherance of a compelling governmental interest” and the burden it imposes is “the least restrictive means of furthering that compelling governmental interest.” Id. § 2000bb-1(b).
In 1993, Congress enacted RFRA in response to the Supreme Court’s path-breaking approach to the First Amendment’s Free Exercise Clause taken in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (holding that neutral laws of general applicability do not burden free exercise whether or not they are supported by a compelling interest). Congress declared that the standard of strict scrutiny RFRA imposes creates “a workable test for striking sensible balances between religious liberty and competing prior governmental interests.” 42 U.S.C. § 2000bb(a)(5). RFRA’s stated purposes included “restoring] the compelling interest test as set forth in Sherbert v. Verner, 374. U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)” and “providpng]. a claim or defense to persons whose religious exercise is substantially burdened by government.” Id. § 2000bb(b)(1), (2). To the extent that it imposes a least-restrictive-means requirement not present in Sherbert or Yoder, however, RFRA “provide^] even broader protection for religious liberty than was available under those decisions.” Burwell v. Hobby Lobby Stores, Inc., 573 U.S. -, - n. 3, 134 S.Ct. 2751, 2761 n. 3, 189 L.Ed.2d 675 (2014).
Following the enactment of the ACA and the promulgation .of the contraceptive mandate, a diverse set of employers brought suit to avoid providing what they viewed as objectionable contraceptive coverage.[18] The Supreme Court first encountered the contraceptive mandate in Burwell v. Hobby Lobby Stores, Inc., 573 U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014).[19] The Court held in Hobby Lobby that enforcing the contraceptive mandate *1177 against a closely held for-profit company that had religious objections to providing contraceptive 'coverage would violate RFRA. Id. at-, 134 S.Ct. at 2785. The Court began by determining- that, as a matter of statutory interpretation, RFRA covers certain for-profit companies because the term “person” was not limited only to natural persons. Id. at -, 134 S.Ct. at 2767-75. Moving to ■ RFRA’s threshold inquiry, the Court “ha[d] little trouble concluding” that the contraceptive mandate imposes a substantial burden on religious exercise. Id. at —, 134 S.Ct. at 2775. The Hobby Lobby plaintiffs had an uncontested “sincere religious belief that life begins at conception” and understood that their belief would be violated if they were required to “provid[e] health insurance that .covers methods of birth control” that “may result in the destruction of an embryo.”. Id. By forcing them to choose between violating-their deeply held convictions and “pay[ing] an enormous sum of money,” the contraceptive mandate “clearly imposes a substantial burden on those beliefs.” Id. at -, 134 S.Ct. at 2779.
The Court specifically and emphatically rejected any argument that the participation of religious objectors, by paying for contraceptive coverage, is “simply too attenuated” from the objectionable outcome, the destruction of embryos, to constitute a burden on religious exercise. Id. at -, 134 S.Ct. at 2777. Such an ‘ argument, which “implicates a difficult and important question of religion and moral philosophy,” would “in effect tell the plaintiffs that their beliefs are flawed” — and defining the scope of religious belief is a dangerous line-drawing inquiry “federal courts have-no business . addressing.” See id. at —, 134 S.Ct. at 2778 (“Instead, our ‘narrow function ... in this context is to determine’ whether the line drawn reflects ‘an honest conviction’” (quoting Thomas v. Review Bd. of Ind. Emp’t Sec. Div., 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981))). Moreover, the Court noted, if the contraceptive mandate’s burden were not substantial, it would “be hard to understand” and “not easy to square” with the exemptions carved out for qualifying “religious employers” facing “exactly the same” burden. Id. at —— n. 33, 134 S.Ct. at 2777 n. 33.
The Court next declined to address whether the' contraceptive mandate furthered a compelling interest because, even if it did, the contraceptive mandate was not the least restrictive means of doing so. Id. at -, 134 S.Ct. at 2779-80. The Court identified several less-restrictive alternatives that the Government could have used to achieve the assumed compelling interest, holding that the contraceptive mandate foundered under RFRA’s “exceptionally demanding” standard. Id. at-, 134. S.Ct. at 2780. The “most straightforward” alternative “would be for the Government to assume the cost” of contraceptive coverage. Id. at -, 134 S.Ct. at 2780. In response to the Government’s contrary position, the Court observed that “it is hard to understand [the] argument that [the Government] cannot be required under RFRA to pay anything” for “a Government interest of the highest order.” Id. at -, 134 S.Ct. at 2781.[20] The Court *1178 also strongly, suggested that the Government’s direct provision of contraceptive coverage would still be a less-restrictive alternative if the Government were required to create “an entirely new program” rather than “modif[y] an existing program (which RFRA surely allows).” Id.
In its analysis the Court decided it “need not rely on the option of a new, government-funded program” to identify a less-restrictive alternative because the regulations already provided one: the then-existing version of the accommodation for employers with religious objections. Id. at —, 134 S.Ct. at 2781-82. The for-profit Hobby Lobby plaintiffs did not object to the accommodation itself, so granting them the option for a third party to provide their female employees’ contraceptive coverage “serves [the Government’s] stated interests equally well.” Id. at -, 134 S.Ct. at 2781-82. Though derided as “ ‘noncommittal’ ” by the dissent for doing so, the Court expressly declined to rule on “whether an approach of this type complies with RFRA for purposes of all religious claims.” Id. at & n. 40, 134 S.Ct. at 2782 & n. 40.
Three days after it decided Hobby Lobby, the Supreme Court again ruled on the contraceptive mandate in Wheaton College v. Burwell, 573 U.S. -, 134 S.Ct. 2806, 189 L.Ed.2d 856 (2014).[21] In Wheaton College, the Court issued an order enjoining the Secretary of Health and Human Services, “pending final disposition of appellate review,” from enforcing the contraceptive mandate against an employer that submits “in writing- that it is a non-profit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services.” Id. at-, 134 S.Ct. at 2807. The parties disputed whether the obligation to provide contraceptive coverage was “dependent” on submitting Form 700 to an insurer or third-party administrator. Id. The Court concluded in its two-page order that, because notice had already been given to the Government, the Government “relying on this notice” could “facilitate the provision of full contraceptive coverage under the [ACA].” Id. The Court ended its order by noting that it “should not be construed as an expression of the Court’s views on the merits.” Id.
After Hobby Lobby and Wheaton College, the federal courts were inundated with cases posing the question presented here: whether RFRA provides relief to employers with religious objections -to the accommodation - itself. Our sister circuits are deeply divided. Like the majority, most circuits have concluded that, though RFRA requires deference to adherents’ sincerely held religious beliefs, “an objective inquiry” to determine whether a law presents' a substantial burden reveals that the accommodation does not impose a substantial burden on religious exercise.[22] Ante at 1142-46; see also Catholic Health Care Sys. v. Burwell, 796 F.3d 207, 216-18 (2d Cir.2015); Geneva Coll. v. Sec’y U.S. Dep’t of Health and Human Servs., 778 F.3d 422, 435-40 (3d Cir.2015), cert. grant *1179 ed sub nom. Zubik v. Burwell, — U.S. -, 136 S.Ct. 444, 193 L.Ed.2d 345 (2015). and cert. granted, — U.S. -, 136 S.Ct. 445, 193 L.Ed.2d 346 (2015); E. Tex. Baptist Univ. v. Burwell, 793 F.3d 449, 456-58 (5th Cir.2015), cert. granted, — U.S. -, 136 S.Ct. 444, 193 L.Ed.2d 345 (2015); Mich. Catholic Conference & Catholic Family Servs. v. Burwell, 807 F.3d 738, 747-49 (6th Cir.2015); Grace Sch. v. Burwell, 801 F.3d 788, 803-05 (7th Cir.2015); Univ. of Notre Dame v. Burwell, 786 F.3d 606, 614-19 (7th Cir.2015); Little Sisters of the Poor Home for the Aged v. Burwell, 794 F.3d 1151, 1176-77 (10th Cir.2015), cert. granted sub nom. S. Nazarene Univ. v. Burwell, — U.S. ——, 136 S.Ct. 445, 193 L.Ed.2d 346 (2015) and cert. granted, — U.S. -, 136 S.Ct. 446, 193 L.Ed.2d 346 (2015); Priests for Life v. U.S. Dep’t of Health and Human Servs., 772 F.3d 229, 246-49 (D.C.Cir.2014), cert. granted sub nom. Roman Catholic Archbishop v. Burwell, — U.S. -, 136 S.Ct. 444, 193 L.Ed.2d 345 (2015) and cert. granted, — U.S. -, 136 S.Ct. 446, 193 L.Ed.2d 345 (2015). The Eighth Circuit and a number of dissenting judges have concluded otherwise, determining that the accommodation substantially burdens religious exercise. See Sharpe Holdings, Inc. v. U.S. Dep’t of Health and Human Servs., 801 F.3d 927, 941-43 (8th Cir.2015), cert. granted, 84 U.S.L.W. 3350 (U.S. Dec. 15, 2015) (No. 15775); E. Tex. Baptist Univ. v. Burwell, Nos. 14-20112, 14-10241, 14-40212, 807 F.3d 630, 633-35, 2015 WL 5773560, at *2-3 (5th Cir. Sept. 30, 2015) (Jones, J., dissenting from denial of rehearing en banc); Grace Sch., 801 F.3d at 810-15 (Manion, J., dissenting); Univ. of Notre Dame, 786 F.3d at 627-29 (Flaum, J., dissenting); Little Sisters of the Poor, 794 F.3d at 1208-10 (Baldock, J., dissenting in part); Little Sisters of the Poor Home for the Aged v. Burwell, 799 F.3d 1315, 1316-18 (10th Cir.2015) (Hartz, J., dissenting from denial of rehearing en banc); Eternal Word Television Network, Inc. v. Sec’y, U.S. Dep’t. of Health and Human Servs., 756 F.3d 1339, 1344-48 (11th Cir.2014) (William Pryor, J., specially concurring in order granting injunction pending appeal); Priests for Life v. U.S. Dep’t of Health and Human Servs., 808 F.3d 1, 6-9 (D.C.Cir.2015) (Brown, J., dissenting from denial of rehearing en banc); Priests for Life, 808 F.3d at 15-20 (Kavanaugh, J., dissenting from denial of rehearing en banc).
C.
To summarize, when Congress enacted the ACA it ceded broad authority to three Executive-branch administrative agencies to promulgate rules governing the availability of women’s preventive health services in employer-sponsored health plans. The agencies ultimately determined that the Government had a compelling interest in providing women with cost-free access to a wide range of contraceptive services. In accordance with that determination, the agencies, through threat of large monetary penalties, mandated that certain employers must provide contraceptive coverage to their female employees. Though Congress had already exempted some types of employers — those with fewer than fifty employees and those with grandfathered health plans — the agencies decided that another group of employers should be exempt too: churches and church-affiliated organizations, as defined by already-existing definitions in the Internal Revenue Code.
The agencies exempted churches and church-affiliated organizations from the contraceptive mandate because the agencies understood that the contraceptive mandate would, impose a substantial burden on many of these organizations’ religious exercise. As a result, churches and church-affiliated organizations may choose *1180 what contraceptive coverage, if any, will be available in their female employees’ health plans. No such exemption, however, was thought necessary for other organizations with similar religious objections, whether for-profit or nonprofit. After much public outcry and litigation, the agencies changed course. At first, the agencies, began offering an exemption-like option to certain nonprofits with religious objections. In response to the Supreme Court’s decision in Hobby Lobby, the agencies extended the same to for-profit religious objectors as well.
But the exemption-like option — the accommodation — did not truly exempt qualifying employers. Rather, it required qualifying employers to affirmatively opt out of providing contraceptive coverage, shifting the obligation to provide the required contraceptive coverage to the employers’ insurer or third-party administrator. Originally, qualifying employers had to opt out by sending Form 700 to the insurer or third-party administrator responsible for the employers’ health plans, alerting the insurer or third-party administrator to its new obligations. After the Supreme Court’s order in Wheaton College, the agencies also made available an option of providing less-formal notice to the Secretary of Health and Human Services. Under this option, the notice is rerouted to-the insurer or third-party administrator, in' lieu of the employer submitting Form 700 directly.
For employers that run self-insured health plans in conjunction with a third-party administrator and are eligible for the accommodation, opting out of the contraceptive mandate has the effect of designating the employers’ third-party administrators as “plan administrators” under ERISA. Once so designated, the agencies can require a third-party administrator to provide contraceptive- coverage. Absent any affirmative action from the employer, third-party administrators remain outside of ERISA’s reach. Likewise outside of ERISA’s reach, -and thus effectively exempt from the contraceptive mandate, are employers that run self-insured health plans without a third-party administrator.
Ás a result, there are four discrete options facing employers like Eternal Word Television Network and the Dioceses, which operate self-insured plans and do not meet the Internal Revenue Code’s definition for churches or church-affiliated organizations but nonetheless have religious objections to providing contraceptive coverage. First, these employers can provide the objectionable coverage in violation of their beliefs. Second, these employers can comply with the accommodation -and affirmatively opt out of the contraceptive mandate, shifting the obligation to provide the required coverage to their insurer or third-party administrator, also in violation of their beliefs. Third, these employers can drop their third-party administrators and assume the costs and responsibilities of running their own health plans. Fourth, these employers can do nothing and thereby become liable for annual fines of thousands of dollars per employee.
This case requires two determinations. First, does the regulatory scheme discussed above impose a substantial burden on the religious exercise, of. Eternal Word Television Network and the Dioceses, which believe that opting out under the accommodation would violate the sanctity of human life? If so, does the regulatory scheme nonetheless survive RFRA’s demanding standard of strict scrutiny? Because I conclude that the answers to these questions are yes and no, while the majority says no and yes, I dissent.
H.
The threshold inquiry under RFRA requires a showing that the Government has *1181 “substantially burden[ed]” the plaintiffs “exercise of religion.” 42 U.S.C. § 2000bb-l; First, a RFRA plaintiff must identify religious exercise that the Government is, burdening. The allegedly burdened exercise “must be sincerely based on a religious belief and not some other motivation.” Holt v. Hobbs, 574 U.S. -, -, 135 S.Ct. 853, 862, 190 L.Ed.2d 747 (2015).[23] When determining the content of a religious belief, including how and to what extent its attendant exercise may be burdened, we defer to the plaintiffs understanding of what his faith requires of him because “[c]ourts are not arbiters of scriptural interpretation.” Thomas v. Review Bd. of Ind. Emp’t Sec. Div., 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981). So long as a religious adherent has drawn a line based on “an honest conviction,” “it is not for us to say that the line he drew was an unreasonable one.” Id. at 715-16, 101 S.Ct. at 1430-31.
Next, we must determine whether, as an objective matter, the identified burden on religious exercise is substantial. The existence of a substantial burden, which “can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct,” turns on whether the Government’s actions coerce a religious adherent to affirmatively violate his beliefs. Midrash Sephardi, Inc. v. Town, of Surfside, 366 F.3d 1214, 1227 (11th Cir.2004). To be substantial, a burden must be “akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly” and must be more than “an inconvenience on religious exercise.” Id. For example, a zoning ordinance that forces members of an Orthodox Jewish congregation to “walk[] a few , extra blocks” to attend services on the Sabbath is not a substantial burden when there is no “religious significance” as to a particular synagogue site, though “walking may be burdensome.” Id. at 1221, 1227-28. In contrast, if the Government puts a religious adherent to,the “choice” of incurring a “serious” penalty or “ ‘engaging] in conduct-that seriously violates [his] religious beliefs,’” then the Government “substantially burdens his religious exercise.”. See Hobbs, 574 U.S. at. -, 135 S.Ct. at 862 (quoting Burwell v. Hobby Lobby Stores, Inc., 573 U.S. —, -, 134 S.Ct. 2751, 2775, 189 L.Ed.2d 675 (2014) (second alteration in the original)). And a burden is no less substantial if the burdened party “is able to engage in other forms of religious exercise’,” if the exercise ift .question is not “compelled” by the burdened party’s religion, or if the'burdened party’s belief is “idiosyncratic.” Id. at -, 185 S.Ct. at 862.
Here, it is overwhelmingly clear that the contraceptive mandate imposes on Eternal Word Television Network and the Dioceses a burden that the accommodation does not alleviate. Eternal Word Television Network and the Dioceses assert a religious belief — which the Government does not contest is sincerely held — that both complying with the contraceptive mandate and opting out under the accommodation, which requires the third-party administrators of their health plans to provide contraceptive coverage, would make them complicit in violating the sanctity of human life. The Government burdens that belief by requiring Eternal Word Television Network and the Dioceses to affirmatively participate in its regulatory scheme.
And it is equally clear that the burden imposed is substantial. The Government puts Eternal Word Television Network and the Dioceses to the “choice” of either *1182 (1) complying with the contraceptive mandate, to which they object on religious grounds; (2) opting out under the accommodation, to which they also object on religious grounds; (3) dropping the third-party administrators of their health plans and becoming de facto insurance companies, -incurring substantial costs and diverting the focus of their religiously motivated operations; or (4) incurring millions of dollars in penalties annually.[24] Besides providing yet another way for the eligible organizations to violate their religious beliefs, the accommodation does nothing to change the Supreme Court’s holding in Hobby Lobby that the contraceptive mandate “clearly imposes a substantial burden on those beliefs.” 573 U.S. at -, 134 S.Ct. at 2779. Eternal Word Television Network and the Dioceses must either violate their beliefs or incur massive monetary costs. On its face, such a “choice” is not a choice at all. Rather, it is a substantial burden on religious exercise.
As I understand it, this straightforward application of RFRA’s- substantial-burden test should end the matter. The majority thinks otherwise, reaching the wrong conclusion for two reasons. First, the majority fails to give proper deference to Eternal Word Television Network and the Dioceses’ sincerely held religious beliefs. Second, the majority mischaracterizes how the contraceptive mandate works by understating the critical role that' the accommodation forces employers to play in providing contraceptive coverage.
Before explaining why the majority fails to give RFRA its proper meaning, it is helpful to clarify how our understandings of RFRA’s inquiry differ. Exactly where we differ is highlighted below:
[[Image here]]
*1183 A.
First, the majority fails to give the proper deference due Eternal Word Television Network and the Dioceses’ sincerely held belief that it would violate the sanctity of human life to comply with the Government’s regulatory scheme, either directly through the contraceptive mandate or indirectly through the accommodation. Though the majority purports to defer-to these beliefs, its deference is largely illusory. The majority begins by correctly observing that RFRA’s substantial-burden inquiry “involves both subjective and objective dimensions.” Ante at 1144. The majority continues on, also correctly, to observe that “courts must accept a religious adherent’s assertion that his religious beliefs require him to take or abstain from taking a specified action.” Id. The majority falters, however, when it concludes that “it is for the courts to determine objectively ... whether the government has, in fact, put plaintiffs to the choice of violating their religious beliefs ... or incurring a substantial penalty.” Id. at 1145.
Contrary' to the majority’s position, RFRA does require deference to religious adherents’ determinations that their sincerely held beliefs are being burdened. “The narrow function of a reviewing court in this context” prevents unnecessary and improper judicial intrusion into highly sensitive matters of moral philosophy or theology, Thomas, 450 U.S. at 716, 101 S.Ct. at 1431, and this understanding of the substantial-burden standard is confirmed by the Supreme Court’s most recent religious-accommodation’ decisions. See Hobbs, 574 U.S. at -, 135 S.Ct. at 861-63 (granting an exemption to a prison’s grooming, policy for a Muslim inmate’s proposed “ ‘compromise’ ” that he be allowed to grow a half-inch-long beard); Hobby Lobby, 573 U.S. at -, 134 S.Ct. at 2775-79 (rejecting the argument that “the connection between” providing contraceptive coverage and the “destruction of an embryo[ ] is simply too attenuated” because this “would in effect tell the plaintiffs their beliefs are flawed.”).
The “objective inquiry” under RFRA focuses only on whether that burden is substantial: For example, courts must defer to a religious adherent’s belief, if it is sincerely held, that dancing is morally wrong.[25] And courts must defer to the religious adherent’s understanding that this belief would be burdened if she were required to look upon, even if only for a moment, a single masquerade ball or sock hop. What courts must determine as an objective matter is whether the burden imposed by any pro-dancing Government action is a substantial one. Imposing millions of dollars in fines for failing to perform a Government-mandated jitterbug would, obviously, be a substantial burden on religious exercise. In contrast, there would be no substantial burden if the Government merely financed public dancefl-oors or had a hortatory policy of extolling the virtues of dance.[26]
If the substantial-burden test were as the majority believes it to be, federal judges would have to decide whether the burden itself substantially violated the adherent’s beliefs. That is, the majority would necessarily shift the gaze of its “objective inquiry” to the merits of religious *1184 belief. In this Bizarro World, it would be secular courts making ex cathedra pronouncements on whether Muslims are truly put out by requirements to shave their beards, Hobbs, 574 U.S. —, 135 S.Ct. 853; Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359 (3d Cir.1999), whether Seventh-day Adventists are sufficiently deterred from accepting employment by requirements to work on Saturdays, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), whether Santería priests could just make do without ritual sacrifice or Ache-infused beads and shells, Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); Davila v. Gladden, 777 F.3d 1198 (11th Cir.2015), and whether the sacramental use of peyote is really that big of a deal to members of the Native American Church, Emp’t Div., Dep’t of Human Res. of Or. v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). But, of course, the Constitution does not vest in the judiciary the authority to declare winners and losers in matters of faith. And for good reason.
At bottom, the majority’s reasoning takes aim at the heart of RFRA itself. Implicit in the majority’s rationale is the notion that wily plaintiffs could game the system if religious adherents’ beliefs were given the full extent of the deference demanded by RFRA. In tailoring their stated beliefs, these plaintiffs could engage in strategic litigation unhampered, impairing the government’s ability to function efficiently. By expanding the limited scope of the objective portion of the substantial-burden inquiry, the majority expressly seeks to avoid “reducing the ... federal courts to ‘rubber stamps.’ ” Ante at 1145. Here, despite conceding as the majority must that “the act. of- opting out plays [some] causal role in the ultimate provision of contraceptive coverage,” the majority runs roughshod over the sincerely held religious objections of Eternal Word Television Network and the Dioceses because, in line with the majority’s sense of things, the “de minimis burden that the plaintiffs face” resulting from their role as “an incidental cause of contraceptive coverage being provided” does not constitute a substantial burden; Id. at 1147-48, 1148-49. The majority through a nifty bit of legalistic legerdemain manages to transform the subjective content of religious adherents’ sincerely held beliefs into an objective question of federal law, undercutting the very deference to religious exercise it purports to extend.
The majority’s not-so-veiled' implication that, if given its full effect, RFRA will be refashioned from a shield protecting the faithful into a sword wielded by cynical opportunists is troubling and at odds with RFRA’s fundamental respect for the deeply held- convictions that guide the daily lives of hundreds of.millions of Americans. As an initial matter, whether or not a belief is sincerely held remains an important part of RFRA’s substantial-burden inquiry. Courts are not, for example, compelled to entertain challenges from such obvious farces as a hypothetical “Church of Marijuana and Pepperoni Pizza”[27] or the satirical “Our Lady of Perpetual Exemption.”[28] Separating the faithful sheep from the cynically opportunistic goats is well within our judicial capabilities.
*1185 Moreover, to the extent that granting exemptions for religious adherents would impair the governnient’s ability to run programs and administer law efficiently, this is a feature of RFRA, not a bug. Congress made the clear policy choice that protecting the individual right of free religious exercise outweighed the costs imposed at the expense of administrative efficiency. And this choice — to preserve individual freedom by fettering the Government’s ability to act as expeditiously as possible — is at the core of our foundational notion of limited government. Permitting demonstrations in public parks, requiring police officers to secure a warrant before searching homes or seizing persons, and committing the Government to provide just compensation if it wishes to take private property all surely hamper the Government’s ability to pursue count less other important ends. These tradeoffs are the cost of liberty. And how best to balance these enhanced protections against their added cos.ts is exactly the sort of, thorny policy decision best left to democratically responsive legislators, not unelected judges.[29]
The majority is hardly alone in its implicit rejection .of RFRA’s core purpose. Striking the proper balance between the collective needs of society and the individual freedom of religious exercise has been fraught with rancor and sectarian strife since time immemorial. Unsurprisingly then, the oft-embattled RFRA has proven a favorite whipping boy from all sides of the legal academy during its twenty-three-year existence. See, e.g., Douglas Ne-Jaime & Reva B. Siegel, Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics, 124 Yale L.J. 2516 (2015); Mary Anne Case, Why “Live-And-Let-Live” is not a Viable Solution to the: Difficult Problems of Religious Accommodation in the Age of Sexual Civil Rights, 88 S. Cal. L.Rev. 463 (2015); Douglas Laycock, Religious Liberty and the Culture Wars, 2014 U. Ill. L.Rev. 839; William P. Marshall, Bad Statutes Make Bad Law: Burwell v. Hobby Lobby, 2014 Sup.Ct. Rev. 71; Michael Stokes Paulsen, A RFRA Runs Through It: Religious Freedom and the U.S.Code, 56 Mont. L.Rev. 249 (1995).
Judicial declaration's that the sky will fall if exemptions were granted to religious objectors in a pluralistic society as diverse and vibrant as the United States are old hat as well. Consider the following statement of Chief Justice Morrison' Waite, written almost one hundred and fifty years ago:
Laws are made for the ■ government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief "superior to the law of the land, and in effect to perrhit every citizen to become a law unto himself. Government could exist only in name under such circumstances.
Reynolds v. United States, 98 U.S. 145, 166-67, 25 L.Ed. 244 (1878). After more than a century of wrestling with the First Amendment’s Free Exercise Clause, the Supreme Court brought constitutional religious-accommodation doctrine full circle in Smith, upholding without accommodation neutral laws of general applicability. *1186 Writing for the majority, Justice Scalia echoed Chief Justice Waite’s sentiment:
If the “compelling interest” test is to be applied at all, then, it must be applied across the board, to all actions thought to be religiously commanded. .Moreover, if “compelling .interests” really means what it says (and watering it down here would subvert its rigor in the other fields where it is applied), many laws will not meet the test. Any society adopting such a system would be courting anarchy, but that danger increases in direct proportion to the society’s diversity of religious beliefs, and its determination to coerce or suppress none of them.
Smith, 494 U.S. at 888, 110 S.Ct. at 1605 (emphasis added). It is. hard to fathom a plainer statement of the risks of reinstitut-ing a policy of religious accommodation.
Yet it was against this very backdrop that Congress enacted RFRA in 1993. And Congress specifically declared that by adopting the demands of strict scrutiny it intended to depart, from the less-protective constitutional . standard announced in Smith. See 42 U.S.C. § 2000bb(4). To .the extent that the standard RFRA imposes raises policy concerns, criticisms on this front are best addressed to Congress, and may find appropriate shelter in the pages of law reviews. But as federal judges we are duty-bound to follow and apply the laws Congress actually enacted, not as we might wish them to be. “The wisdom of Congress’s judgment on this matter is not our concern. Our responsibility is to enforce RFRA as written, and under the standard that RFRA prescribes,” Hobby Lobby, 573 U.S. at -, 134 S.Ct. at 2785, the accommodation, no less than the contraceptive mandate itself, imposes a substantial burden on.religious exercise..
B.
Second, the majority fails to appreciate the crucial role in providing religiously objectionable contraceptive coverage that the accommodation foists on eligible organizations. The majority believes- that the accommodation places no burden on the beliefs of Eternal Word Television Network and the Dioceses because the “significance they attribute to this act [of opting out]” is misguided, and thus the outcome of this case is not controlled by the- otherwise-identical analysis in Hobby Lobby. See ante at 1148. According to the majority, “[t]he ACA and HRSA guidelines” are what “entitle women who are plan participants and beneficiaries covered by group health insurance plans to contraceptive coverage without cost sharing” — “not the opt out.” See id. at 1149. This is so even though the majority “acknowledge[s] that an eligible organization’s act of [opting out] results in the TPA’s designation as the plan administrator” under ERISA and “may be an incidental cause of contraceptive coverage being provided.” Id. at 1147-48. Boiled down to its bare essentials, the-majority’s position is that if the parties really understood what is going on, they would have no basis to object to their role in the contraceptive mandate’s-regulatory scheme.
It is the majority, however, that misunderstands the contraceptive mándate. Under its regulatory scheme, as bounded by the statutory requirements of the ACA and ERISA,[30] the Government becomes *1187 empowered to require contraceptive coverage for an eligible organization’s self-insured health plan only if that organization affirmatively opts out under the accommodation. A third-party administrator of a self-insured health plan “bears the legal obligation to provide contraceptive coverage only upon receipt of a valid self-certification.” [31] Wheaton College v. Burwell, 573 U.S. —, - n. 6, 134 S.Ct. 2806, 2814 n. 6, 189 L.Ed.2d 856 (2014) (Sotomayor, J., dissenting) (emphasis added). The majority is incorrect, then, to say that the contraceptive mandate “does' not turn on whether [an] eligible organization employer chooses to comply with the law.” See ante at 1149. Federal law kicks in only after an eligible organization acts; should an eligible organization decline to do anything, the Government lacks an independent means to ensure the provision of contraceptive coverage. Because the regulations condition the provision of contraceptive coverage on eligible organizations’ affirmative participation, their participation is the linchpin on which the contraceptive mandate rests.
To draw an analogy with which any first-year law student should be well acquainted, an eligible organization’s opting out under the accommodation is both an actual and proximate cause of the provision of contraceptive coverage. There can be. no doubt that opting out under the accommodation is a “cause in fact” of providing contraceptive coverage. But for opting out, the Government would lack the requisite regulatory authority over the third-party administrators of the organizations’ health plans. Cf. Stacy v. Knickerbocker Ice Co., 84 Wis. 614, 54 N.W. 1091 (1893) (noting that without defendant’s cutting and removing of surface ice, uncontrolled horses would not have fallen through a frozen lake). The majority contests whether the act of opting out also meets some standard of “legal” or “proximate” cause. See Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99, 104 (1928) (Andrews, J., dissenting) (“What we do mean by the word ‘proximate’ is that, because of convenience, of public policy, of á rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point; That is not logic, it is practical politics.”). According to the majority, because federal law entails the authorization to require third-party administrators to provide contraceptive coverage, opting out is only “an incidental cause of contraceptive coverage being provided.” See ante at 1147-48.
I fail to see, however, how affirmatively opting out ’of the contraceptive mandate under the accommodation could be deemed anything other than a “substantial factor” or “material concurring cause” directly leading to the provision of religiously objectionable coverage. Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co., 146 Minn. 430, 436-37, 439, 179 N.W. 45 (1920). Opting out under the accommodation sets in motion a chain of events leading tó the provision of contraceptive coverage as inexorably as night follows day.[32] Once an employer opts out, only then does the Government become authorized to regulate third-party administrators. *1188 See Grace Sch. v. Burwell, 801 F.3d 788, 808 (7th Cir.2015) (Manion, J., dissenting) (describing “the accommodation’s tangled mess” as “the long and -winding extension cord the government uses to power its contraceptive mandate”). So authorized, there can be no doubt that the Government will in turn flex its newfound regulatory muscle to require the provision of contraceptive coverage.
This clear and uninterrupted causal chain holds whether an employer sends Form 700 directly to its third-party administrator or submits less-formal notice indirectly to the Secretary of Health and Human Services, just as a pilot reaches his destination as certainly flying direct. as with a. layover,. An employer connecting these dots would hardly need the insight of Henry Friendly,to. conclude that its actipns caused, in a direct and material fashion, the religiously objectionable outcome. “After all, if the. form were meaningless, why would the Government require it?” Priests for Life v. U.S. Dep’t of Health and Human Servs., 808 F.3d 1, 20 (D.C.Cir.2015) (Kavanaugh, J., dissenting from denial of rehearing en banc)
But this analogy can bé stretched only so far. Common-law principles of causation, however fundamental to our legal heritage, are simply too unreliable a light to guide RFRA’s substantial-burden analysis.[33] Reading into RFRA some sort of proximate-cause limitation would reintroduce the exact same “attenuation]” argu-. ment rejected by the Supreme Court in Hobby Lobby for ‘‘dodging] the question that RFRA presents.” 573 U.S. at -, 134 S.Ct. at 2777-78. To do so would be an illegitimate foray into the realm of personal faith, and federal courts are “singularly ill equipped” to parse the moral reasoning and theological conclusions of religious believers, especially in light of secular judges’ unspecified and almost certainly inconsistent determinations of legal causation. Thomas, 450 U.S. at 715, *1189 101 S.Ct. at 1431. No matter how elaborate the Rube Goldberg machine the Government manages to jerry-rig, it is simply not our place to decide for Eternal Word Television Network and the Dioceses their degree of complicity when forced to topple the initial domino;
Accordingly, for eligible organizations that object to opting out under the accommodation, the contraceptive mandate burdens their religious exercise to the same impermissible extent as the plaintiffs’ in Hobby'Lobby.
III.
Concluding that the .contraceptive mandate substantially burdens Eternal Word Television Network’s and the Dioceses’ religious exercise does not end the matter. The Government can still prevail if it is able to show that the contraceptive mandate is “in furtherance of a compelling governmental interest” and the accommodation is “the least restrictive'means of furthering that compelling governmental interest.”' 42U.S.C. § 2000bb-1(b).
The Government fails to make this showing. For purposes of this opinion, I assume that the accommodation serves “a legitimate and compelling interest in the health, of female employees.”[34] See Burwell v. Hobby Lobby Stores, Inc., 573 U.S. -, -, 134 S.Ct. 2751, 2786, 189 L.Ed.2d 675 (2014) (Kennedy, J., concurring). There is no need to reach the merits of this assumed compelling interest, whatever its exact nature, because the accommodation is not the least-restrictive means capable of achieving any government interest that could conceivably be called compelling. Accord id. at -, 134 S.Ct at 2779-80 (Alito, J.).
IV.
If the notion that the accommodation does not substantially burden religious exercise is “[rjpbbish,” Eternal Word Television Network, Inc. v. Sec’y, U.S. Dep’t of Health and Human Servs., 756 F.3d 1339, 1347 (11th Cir.2014) (William Pryor, J., concurring), then the majority’s further notion that the contraceptive mandate passes RFRA’s “exceptionally demanding” scrutiny is rubbish on stilts. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. —, -, 134 S.Ct. 2751, 2780, 189 L.Ed.2d 675 (2014); In codifying the familiar language of strict scrutiny — the “most demanding test known to constitutional law,” City of Boerne v. Flores, 521 U.S. 507, 534, 117 S.Ct. 2157, 2171, 138 L.Ed.2d 624 (1997)— Congress erected RFRA as a mighty bulwark, entrenching against Government incursion the freedom of religious liberty throughout the United States Code. To surmount these protections, the Government has the burden of “showing] that it lacks other' means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties.” Hobby Lobby, 573 U.S. at -, 134 S.Ct.at 2780. Carrying this burden is no mean feat. “If a less restrictive means is available for the Government to achieve its goals, the Government must use it.” Holt v. Hobbs, 574 U.S. ——, -, 135 S.Ct. 853, 864, 190 L.Ed.2d 747 (2015) (Quoting United States v. Playboy Entm’t Grp., Inc., 529 U.S. 803, 815, 120 S.Ct. 1878, 1887, 146 L.Ed.2d 865 (2000)) (alteration omitted).
*1190 So, is there a less-restrictive alternative of ensuring that the female employees of employers with religious objections to the contraceptive mandate nonetheless continue to receive cost-free access to the challenged services? Of course there is. As the Hobby Lobby majority observed: “The most straightforward way of doing this would be for the Government to assume the cost of providing” the objectionable contraceptive coverage. 573 U.S. at -, 134 S.Ct. at 2780. Though the Court did not ultimately need to reach the question of whether direct Government provision of contraceptive coverage would constitute a less-restrictive alternative because the plaintiffs did not object to the accommodation, id. at -, 134 S.Ct. at 2780-82, we must do so here. And I fail to see any reason why the Court’s persuasive reasoning-should not be adopted. The Government has not shown, as it must, that it would be able to provide the same access to contraceptive coverage to the same women only if it can force eligible organizations to violate their sincerely held religious beliefs.
Speaking bluntly, RFRA makes the Government put its money where its mouth is. I see nothing in RFRA’s text or the subsequent case law that would allow the Government to claim a compelling interest without having to spend a single red cent to do anything about.it. Significant here, the Government must necessarily agree that RFRA compels it to fund contraceptive coverage-otherwise the accommodation would not exist at all. Indeed, the entire purpose of the accommodation is to make the provision of contraceptive coverage independent of the eligible organization, including segregating all the costs paid by the eligible organization from all the expenditures for the objectionable services. Aware of the fallacy of free-lunch thinking and absent any expectation of third-party administrators acting out of purely eleemosynary impulse, the Government committed itself to funding contraceptive coverage for certain religious objectors,[35] albeit in roundabout fashion.
To be clear, the Government is already committed to fund the contraceptive mandate under the current regulations. The Government reimburses third-party administrators required to fund contraceptive coverage through a reduction in Federally-facilitated Exchange user fees, the amount of money paid to be able to offer insurance products on exchanges established by' the Government under the ACA.[36] Money is fungible; the Govern *1191 ment finds itself in the same financial position whether it declines to collect a tax liability of $500 or whether it collects the $500 and then immediately refunds the same. By forgoing revenue to fund the contraceptive coverage for the female employees of eligible organizations that opt out under the accommodation, the Government is effectively paying for the objectionable coverage. And in contrast to the half-measure of the accommodation— which covers only a limited set of religiously objecting employers and does not provide access to the female employees of churches and church-affiliated organizations, employers with grandfathered health plans, or employers with fewer than fifty full-time employees[37] — providing for contraceptive coverage directly without the accommodation’s administrative: rigmarole would allow the Government to offer cost-free access to each and every-woman in the United States should it choose to do so. And the Government has failed to shoulder its burden to show that it would be unable to grant women access to- contraceptive coverage without the coerced involvement of Eternal Word Television Network and the Dioceses.
Again, this straightforward application of well-established legal principles should carry the day. But, again, the majority thinks otherwise. Specifically, the majority concludes that the current iteration of the contraceptive mandate has finally hit upon the least restrictive means of achieving the Government’s compelling, interest when “the cost to the government” and “the burden the alternatives impose on the affected women” are taken into account. See ante at 1158. Though I do not dispute that these concerns are relevant to the least-restrictive-means inquiry, I cannot agree with the majority that they save the contraceptive mandate from RFRA’s exceptionally demanding scrutiny.
The arguments advanced in the majority’s apology for the contraceptive mandate seem to rest largely on speculative and overblown logistical problems the Government might face if it were held responsible for furthering its asserted compelling interest. According to the majority, if the Government were forced to provide contraceptive coverage “outside the existing, largely employer-based, insurance system,” whether directly or through tax credits, “Congress would need to pass legislation that would fundamentally change how the majority of Americans receive” contraceptive coverage specifically, if not healthcare generally. See id. at 1159. Likewise, if forced to keep the current model of providing contraceptive coverage through eligible organizations’ health plans, “the government would be hamstrung” because of the “gaps” in institutional knowledge that would spring up re-gárdiñg which female employees of which employers would be covered by the Government and which are not. Id. at 1160. As a result, because the majority believes that adopting any of the alternatives it considers would incur various administrative and transactions costs, the result would be less access to contraceptive cov *1192 erage, undermining the Government’s asserted compelling interest. See id. at 1158-59,1161.
The majority’s insistence on assuming a virtually immutable regulatory and statutory status ' quo is fundamentally' misplaced. RFRA makes clear that it is the “Government ” that “shall not substantially burden a person’s exercise of religion,” 42 U.S.C., § 2000bb-1(a) (emphasis added), not just constituent parts acting within their respective spheres of .authority. In Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, for example, the Supreme Court specifically rejected the Government’s position “that the .Controlled Substances Act is [not] amenable to judicially crafted exceptions [for the hallucinogen hoasca]” because of “the existence of a congressional exemption for peyote.” 546 U.S. 418, 434, 126 S.Ct. 1211, 1222, 163 L.Ed.2d 1017 (2006). It would be absurd to say, then, that we cannot grant a judicially crafted exception here because the relevant administrative agencies lacked the regulatory authority to promulgate exceptions that would have been equally effective in achieving an allegedly compelling interest had there been congressional action allowing them to do so. In short, if the Government as a whole has a less-restrictive alternative available, the Government must use it.
The majority’s radically revisionist account of RFRA, in contrast, would limit the universe of less-restrictive means to what the Executive Branch can accomplish unilaterally by administrative fíat. This is a shocking reversal of our Constitution’s prime directive: “All legislative Powers herein granted shall be vested in a Congress of the United States.” U.S. Const, art. I, § 1. To the extent that the Government claims an* interest of the highest order, it is only reasonable that Congress be expected to pitch in when freewheeling regulators encounter statutory roadblocks. The practical' hurdles to providing the access to contraceptive coverage the Government seeks would simply disappear if Congress were to slightly tweak the contraceptive mandate’s statutory authorization under ERISA and the ACA. By having Congress eliminate the need for eligible organizations to affirmatively designate the third-party administrators of their'health plans — thus becoming directly involved in the provision "of the objectionable coverage — the Departments of Labor, Treasury, and Health and Human Services woúld no longer need to substantially burden eligible organizations by putting them to the “choice” of affirmatively violating their sincerely held beliefs or paying massive penalties. ‘ And the Government has failed- to show why this could be accomplished without imposing any additional burden on female employees only if eligible organizations were required to use the accommodation.[38]
Finally,' the fate of the contraceptive mandate under RFRA is complicated by the Government’s decision to condition benefits flowing to third parties on actions taken by religious objectors in violation of their beliefs. I agree that granting an exemption that would impose costs on third parties could, under pertain circumstances, run afoul of the Establishment *1193 Clause of the First Amendment. See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter day Saints v. Amos, 483 U.S. 327, 334-35, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987) (“At some point, accommodation may devolve into ‘an unlawful fostering of religion.’ ” (quoting Hobbie v. Unemployment Appeals Comm’n of Fla., 480 U.S. 136, 145, 107 S.Ct. 1046, 1051, 94 L.Ed.2d 190 (1987))). But such an eventuality alone does not automatically transform the Government’s chosen means into the least-restrictive alternative required by RFRA. As the Supreme Court reiterated in upholding the constitutionality of RLUIPA, RFRA’s sister statute, “ ‘there is room for play in the joints between’ the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense' to the Establishment Clause.” Cutter v. Wilkinson, 544 U.S. 709, 713, 125 S.Ct. 2113, 2117, 161 L.Ed.2d 1020 (2005) (quoting Locke v. Davey, 540 U.S. 712, 718, 124 S.Ct. 1307, 1311, 158 L.Ed.2d 1 (2004)). Granting Eternal Word Television Network and the Dioceses an exemption from the contraceptive mandate falls well within the space allowed for “play in the joints,” wherever those exact boundaries may lie.
Here, the Government is essentially asking for a free pass on RFRA’s least-restrictive-means requirement because the administrative agencies responsible' for crafting the contraceptive mandate decided — for administrative convenience — to tie the provision of contraceptive coverage to eligible organizations’ affirmative participation in an elaborate regulatory scheme. If we were to honor the Government’s request, anytime regulators wanted to immunize their slapdash efforts, regardless of the potential alternatives, they need only condition a benefit to third parties on any substantial burden placed on religious exercise. Lest RFRA is understood to have ushered in the apotheosis of the administrative state, surely the rigorous standard of‘strict scrutiny cannot be so easily evaded. • ■ •
Without a doubt, there are sundry ways for the Government to provide women with cost-free' access to contraceptive coverage. The administrative agencies tasked with promulgating the 'regulatory structure that undergirds the contraceptive mandate chose, because of convenience and their bounded statutory authority, to do so in a manner that substantially burdens' religious adherents. We have been presented insufficient evidence to hold that the goal of increasing access to contraceptive coverage could be reached only "through the circuitous regulatory pathways that have been cobbled together here. The Government, therefore, has failed to carry its burden to show that the contraceptive mandate is' the least restrictive means of furthering any'assumed compelling interest. '
v;
The sweeping protections for religious exercise Congress contemplated when it enacted RFRA should not be denied- to Eternal Word Television Network and the Dioceses. RFRA’s text and purpose, as confirmed by well-established precedent, extend these protections to religious adherents forced to choose between affirmatively participating in a regulatory scheme that they sincerely - believe would make them complicit in denigrating the sanctity of human life and paying millions of dollars in noncompliance penalties. Because the Government cannot show that the latest iteration of its constantly evolving “accommodation” survives strict scrutiny, RFRA bars enforcing the contraceptive mandate against those employers whose religious exercise it substantially burdens.
By concluding otherwise, the majority diminishes the full range of religious liber *1194 ty that Congress sought to protect when it enacted RFRA. Recasting and enfeebling RFRA’s standard as nothing more than “good enough for government work” is a far cry from strict scrutiny’s typical charge of fiat justitia,mat caelum[39] Perhaps the majority’s desire to bring RFRA’s statutory protections for religious liberty closer in line with the less-demanding constitutional standard represents a superior policy judgment. Perhaps not. In any event, the majority’s application of “water[ed] down” strict scrutiny is exactly the sort of wishy-yrashy treatment likely to “subvert its rigors in the other fields where it applies” that motivated the Supreme Court’s Smith decision in the first place. See Emp’t Div., Dep’t of Human Res. of Or. v. Smith, 494 U.S. 872, 888, 110 S.Ct. 1595, 1605, 108 L.Ed.2d 876 (1990). But by enacting RFRA, Congress confirmed that strict scrutiny “really means what it says.” Id.; see also Hobby Lobby, 573 U.S. at - n. 3, 134 S.Ct. at 2761 n. 3. Regardless of individual judges’ views of the wisdom motivating RFRA, that was Congress’s call to make.
Respectfully, I DISSENT.

.The Institute of Medicine’s recommendations, were laid, out in its report Clinical Preventive Services for Women: Closing the Gaps, which was released on July 19, 2011 Like much of the ACA, that report and the process used to generate it sparked significant controversy, prompting public backlash and a dissent from one of the committee members. Inst, of Med., Clinical Preventive Services for Women: Closing the Gaps Appendix D at 231-35 (2011)(Anthony Lo Sasso, dissenting); see also Grace Sch. v. Burwell, 801 F.3d 788, 815 22 (7th Cir.2015) (Manion, J., dissenting); 77 Fed.Reg. 8725, 8725-26 (Feb. 15, 2012); Helen M. Alvare, No Compelling Interest: The "Birth Control" Mandate and Religious Freedom, 58 Vill. L.Rev. 379, 391-431 (2013). Because I assume that the Government has a compelling interest in providing the preventive services at issue in this case, I pass no judgment on the Institute of Medicine’s report or its contents.

. As in the majority's opinion, for convenience when discussing the Departments’ regulations I will cite only those of the Department of Health and Human Services unless otherwise indicated.

. ■ The Government does predict that grandfathered health plans will be phased out over time as part of a planned "transition period" designed "to avoid undue disruption.” It is. ultimately an empirical question how many grandfathered plans are currently in effect and how many will persist in.the future. The record developed in this case, as in so many other respects,, betrays no answer.

. The development of the current iteration of the contraceptive mandate — which ■ has changed multiple times since these suits was first brought, though not in ways .that materially alter the RFRA inquiry — has been largely *1172 defined by. how to treat religiously objecting employers, inspiring hundreds of thousands of comments from interested stakeholders. See 75 Fed.Reg. 41726, 41726-56 (July 19, 2010); 77 Fed.Reg. 8725, 8725-29 (Feb. 15, 2012); 77 Fed.Reg. 16501, 16501-08 (Mar. 21, 2012); 78 Fed.Reg, 8456, 8456-72 (Feb: 6, 2013); 78 Fed.Reg. 39870, 39870-92 (July’ 2, 2013); 79 Fed.Reg. 51092, 51092-98 (Aug. 27, 2014); 79 Fed.Reg. 51118, 51118-25 (Aug. 27, 2014); 80 Fed.Reg. 41318, 41318-41 (July 14, 2015). ,

.-- As the term "church” is hardly self-defining, the IRS uses a fourteen-factor test to determine which organizations make the' cut. See Internal Revenue Serv., Pub. 1828: Tax Guide for Churches & Religious Organizations 33 (2015), available at https://www.irs.gov/pub/ irs-pdf/pl828.pdf,

. The current version of § 147.131 took effect on September 14, 2015. In response to the Supreme Court’s decisions in Burwell v. Hobby Lobby Stores, Inc., 573 U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014) and Wheaton College v. Burwell, 573 U.S. -, 134 S.Ct. 2806, 189 L.Ed.2d 856 (2014), § 147.131 how extends to cover qualifying "closely held for-profit entities]” in addition to religious nonprofits, and expands the available methods of opting out of the contraceptive mandate. Compare 45 C.F.R. § 147.131, with 45 C.F.R. § 147.131 (effective Aug. 27, 2014 to Sept. 13, 2015), and 45 C.F.R. § 147.131 (effective Aug. 1, 2013 to Aug. 26, 2014), The relevant portion of § 147.131 now provides in full:
(b) Eligible organizations. An eligible organization is an organization that meets the criteria of paragraphs (b)(1) through (3) of this section.
(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 147.130(a)(l )(iv) on account of religious, objections.
(2) (i) The organization is organized and opérales as a nonprofit entity and holds itself out as a religious organization; or
(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (b)(4) of this section, and the organization’s .highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization’s applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owners’ sincerely held religious beliefs.
(3)The organization must self-certify in the form and manner specified by the Secretary • of Labor or provide notice to the Secretary of Health and Human Services as described; in *1173 paragraph (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the- certification or notice on behalf of ■ the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of BRISA.

. For example. Eternal Word Television Network has a self-insured health plan for which Blue bross Blue Shield of Alabama serves as third-party administrator. The Dioceses col- ' lectively maintain three self-insured health plans, for all of which Meritain Health serves as third-party, administrator. Though Blue Cross .Blue Shield of Alabama and Meritain Health máy "separately offer insured plans, they are not responsible for paying the claims of Eternal Word Television Network's and the Dioceses’ beneficiaries. '■

; In the pre-Wheaton College iteration of- the contraceptive mandate, there was only one way to opt out under the accommodation: submitting Employee Benefits " Security Administration Form 700 to the relevant insurer or third-party administrator. See infra n. 11.

. A copy of Form 700 is-appended to the majority’s opinion.

. The reason that eligible organizations are given two similar-seeming options for opting out of the contraceptive mandate stems from the Supreme Court’s decision in Wheaton College v. Burwell, 573 U.S. -, 134 S.Ct. 2806, 189 L.Ed.2d 856 (2014). In Wheaton College, the. Supreme Court enjoined enforcement of the contraceptive mandate against an eligible organization that sent written notice to the Government but objected, based on the organization's religious beliefs, to sending Form 700 to its insurer and third-party administrator. Id. at -, 134 S.Ct. at 2807. The Court did not address the situation presented here where an eligible organization objects, on religious grounds, both to completing Form 700 and to providing less-formal notice to the Secretary of Health and Human Services.

. Because this case does not involve eligible organizations with insured plans, I pass no judgment on the accommodation in that context.

. As mentioned above, eligible organizations that administer their own self-insured plans are not subject to the contraceptive mandate under the regulations.

. Under ERISA, a third-party administrator that is neither the ‘‘plan sponsor” nor specifically designated as such can be considered the “plan administrator” only “as the Secretary [of Labor] may by regulation prescribe.” 29 U.S.C. § 1002(16)(A)(iii). The Government contends that, as currently written, the ACA’s implementing regulations also allow it to independently enforce the contraceptive mandate against third-party administrators of self-insured plans without any further action from the eligible organization. The truth of this contention is far from certain. See ante at 1149 & nn. 30-31; Sharpe Holdings, Inc. v. U.S. Dep’t of Health and Human Servs., 801 F.3d 927, 935 n. 8 (8th Cir.2015) (collecting cases contrary to the Government's position). In any event, I decline to pass judgment on this question because its resolution is unnecessary to decide this case.

. If a third-party administrator declines to provide contraceptive coverage, eligible organizations with self-insured plans must select another willing third-party administrator, administer its own health plan, or become subject to the monetary penalties discussed above.

. Specifically, the regulations contemplate “adjustments” to the third-party administrator's own user fees, if the third-parly administrator also offers health plans on a Federally-facilitated Exchange, or the user fees of another participating insurer that the third-party administrator contracts with to receive reimbursement. See 80 Fed.Reg. at 41328. Third-party administrators are to be reimbursed for the "total dollar amount of the payments for contraceptive services” and an "allowance for administrative costs and margin” of “no less than 10 percent” for the amount spent on contraceptive services. 45 C.F.R. § 156.50(d)(3)(i), (ii). The Government does not address how reimbursement will be made, if at all, should these user fees *1176 prove insufficient. Cf. King v. Burwell, 576 U.S. -, -, 135 S.Ct. 2480, 2487, 192 L.Ed.2d 483 (2015) (noting that the ACA contemplates that each state will create its own exchange),

. RFRA originally- applied to the actions of state governments as well, but the Supreme Court held that extending RFRA’s mandate to the states exceeded Congress's powers under § 5 of the Fourteenth Amendment. City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

. Though the bulk of this litigation has been brought under RFRA, at least one non-religious employer has challenged the contraceptive mandate under the Fifth Amendment. See March for Life v. Burwell, No. 14-cv-1149(RJL), 128 F.Supp.3d 116, 2015 WL 5139099 (D.D.C. Aug. 31, 2015) (concluding that the contraceptive mandate violates equal-protection principles because it lacks a rational basis for discriminating between religious and non-religious objectors). Because this case involves- only employers with religious objections and is resolved by RFRA’s clear dictates, I decline to address the constitutional propriety of applying the contraceptive mandate to nonreligious objectors.

.Justice Alito wrote the majority opinion in Hobby Lobby, joined by Chief Justice Roberts and Justices Scalia and Thomas. Justice Kennedy - concurred. Justice Ginsburg dissented, joined in full by Justice Sotomayor and in relevant part by Justices Breyer and Kagan.

. Requiring the Government to, at times, spend additional monies to avoid imposing substantial burdens, on the free exercise of religious objectors would accord with RFRA’s sister statute, the Religious Land Use and Institutionalized Persons Act (“RLUIPA”), 42 U.S.C. §§ 2000cc, 2000cc-1. See id. § 2000cc-3(c) (”[T]his chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise.”). Congress enact-éd RLUIPA pursuant to the Spending and Commerce Clauses after the Supreme Court in City of Boerne held that RFRA could not be applied to the actions of state governments under § 5 of the Fourteenth Amendment. See supra note 17. The standard of RLUIPA mir *1178 rors that of RFRA and applies in two contexts: land-use regulation and the religious exercise of institutionalized persons,

. Chief Justice Roberts .and Justices Alito, Thomas, Kennedy, and Breyer joined the Court's decision in Wheaton College. Justice Scalia concurred without issuing a separate opinion. Justice Sotomayor dissented, joined by Justices Ginsburg and Kagan.

. Lumping together these decisions in this manner necessarily misses some of their nuance. Again, this case is limited to eligible organizations with self-insured health plans overseen by third-party administrators that object, on religious grounds, to the accommodation.

. Though Hobbs involved a claim brought under RLUIPA rather than RFRA, both statutes impose the same standard for substantial burdens of-religious exercise. See, e.g., Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir.2004),

. Should it fail to comply with the contraceptive mandate, Eternal Word Television Network would face annual penalties of up to $12,775,000 for its 350 full-time employees. See Eternal Word Television Network, Inc. v. Sec'y, U.S. Dep’t of Health and Human Servs., 756 F.3d 1339, 1341-42 (11th Cir.2014) (William Pryor, J., specially concurring in order granting injunction pending appeal). The Dioceses’ three health plans are collectively responsible for almost 2,000 employees and would be subject to roughly $73,000,000 per year. See Roman Catholic Archdiocese of Atlanta v. Sebelius, No. 1:12-cv-03489-WSD, 2014 WL 1256373, at *2 (N.D.Ga. Mar. 26, 2014); 26 U.S.C. § 4980D(b)(1).

. Many faith traditions proscribe some or all forms of dancing, including various denominations of Christianity, islam, and Judaism.

. Indeed, it appears that Congress has contemplated adopting such a measure. See H.R. Res. 667, 113th Cong. (2014) (as introduced in the House, July 11, 2014) ("Expressing support for dancing as a form of valuable exercise and artistic expression, and for the designation of July 26, 2014, as National Dance Day.”).

. Of course, people can and do sincerely believe that marijuana consumption serves a sacramental purpose. See, e.g., Olsen v. Drug Enf't Admin., 878 F.2d 1458 (D.C.Cir.1989).

. See God bless John Oliver: latenight comedian forms his ' own church, The Guardian (Aug. 17, 2015), http://www.theguardian.com/ tv-and-radio/2015/au’g/l 7/john-oliver-last-week-tonight-mega-church.

. ‘‘[T]hat one legislature cannot ,abridge the powers of a succeeding legislature” and, thus, “one legislature is competent to repeal any act which a former legislature was competent to pass” is a foundational principle that "can never be controverted.” Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 135, 3 L.Ed. 162 (1810). RFRA’s protections are statutory, not mandated by the Constitution. Should it wish to do so, Congress remains free to alter the scrutiny to be applied to any particular law challenged under RFRA or to repeal RFRA altogether.

. Some doubts have been raised as to the Government's exact ability to require third-party administrators to comply with the contraceptive mandate within the scope of its regulatory authority. See Sharpe Holdings, Inc. v. U.S. Dep't of Health and Human Servs., 801 F.3d 927, 941-42 (8th Cir.2015). To the extent such doubts linger, they are of no moment here. "We need look no further than to the government’s own litigation behavior to gauge the importance of self-certification in the regulatory scheme. If [third-party administrators] had a wholly independent obligation *1187 to provide contraceptive coverage to religious objectors’ employees and' plan beneficiaries, there would be no need to insist on ... compliance with the accommodation process.” Id. at 942. .

. Under the regulations currently in force, a valid self-certification is either Form 700. or the alternative notice sent to the Secretary of Health and Human Services. 45 C.F.R. § 147.131(b)(3), (c).

. Eternal Word Television Network and the Dioceses object only to their own, gov- . ernment-mandated participation under the contraceptive mandate. They do not — and indeed cannot — seek "to require the Government itself to behave” in accordance ■ with their beliefs. See Bowen v. Roy, 476 U.S. 693, 696-700, 106 S.Ct. 2147, 2150-52, 90 L.Ed.2d 735 (1986) (denying relief to Abenaki man objecting on religious grounds to the Government’s “ ‘use’ ” of his daugh *1188 ter's already-issued Social Security number). The majority’s reliance on Bowen and its ilk is, therefore; inapposite. '
Likewise inapposite is the Majority’s analogizing the accommodation to the process used by conscientious objectors to opt of a military draft. See ante at 1148. As Judge Manion puts it in his thorough debunking of this familiar trope,
This is not like the case of a- conscientious, objector who objects and the government finds a replacement. Under the regulations, the government does not find the replacement, the nonprofit does. The designation does not take place unless the nonprofit either delivers the self-certification form to its insurer or TP A, or uses the alternative notice to inform the government who its insurer or TPA is and which health plan is at issue. By insisting that the- nonprofit deliver the form or supply the plan information for the government's use, the government uses the objecting nonprofit to do its dirty-work. • ■ The government has not provided an exit — it offers a revolving door with only one opening.
This is not the case of a conscientious objector walking into the draft board, voicing his objection, being excused, and walking out. For the analogy to fit the HHS accommodation, the draft board must decide that every objector will be replaced by the objector’s friend, and the objector’s objection is only effective if the objector delivers written notice of his objection' to his friend or tells the draft board who his friend is and where the board can find him. Then, the objector must send his friend money so that his friend will remain his friend for the purpose of being his replacement.
Grace Sch. v. Burwell, 801 F.3d 788, 812 & n. 11 (7th Cir.2015) (Manion, J., dissenting).

. "There is- perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion [as defining ‘proximate cause’]. Nor, despite the manifold attempts which have been made to clarify the ' subject, is there yet any general agreement as tó the'best approach.” W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G, Owen, Prosser and Keeton On Torts § 41 at 263 (5th ed. 1984).

. I pause to note my skepticism of the Government's proposed gloss on the, compelling interest allegedly served by the contraceptive mandate. Providing "seamless” contraceptive coverage — that is, providing coverage without cost sharing or additional administrative hurdles — and identifying organizations that opt out of the contraceptive mandate . appear to me to-be derivative considerations of feasibility arid administrative convenience rather than compelling interests in their own right. As such, these considerations‘are better left to the least-restrictive-means prong of the RFRA inquiry.

. Notably, the Government did not similarly commit itself to fund contraceptive coverage for female employees of other employers with religious objections — either churches and church-affiliated organizations or eligible organizations that maintain self-insured-health plans but do not use a third-party administrator. Nor did the Government commit itself to fund contraceptive coverage for female employees of employers with grandfathered plans or employers with fewer than fifty full-time .employees.
Though there .may be some level of backstop coverage provided by the other provisions of the ACA. and Title X, see infra n. 36,, the Government's failure to extend its largesse to these women may also call into question the contraceptive mandate’s asserted compelling interest — which, again, I assume the Government would be able to show — but certainly raises an obvious question: If the Government is able and willing to pay for some women to receive access to contraceptive coverage, why would it not be a less-restrictive means to do .so in a more straightforward manner for all women at risk of being denied such access?

. As discussed above, third-party administrators may either reduce their own Federally-facilitated Exchange user fees if they are also in the business of selling insurance or they may enter into a contractual arrangement with another insurer to recoup that insurer’s user fees. See 80 Fed.Reg. at 41328.

. For female employees whose health plans are not subject to the contraceptive mandate, the Government has stitched together a patchwork safety net under Title X and other, provisions of the ACA. The record does not reveal how many women who would otherwise lack access to contraceptive services are eligible for coverage under this makeshift framework. Nor does the record reveal whether there are hundreds, thousands, or millions of women who will continue to go without such access, with or without the accommodation. Though a less-restrictive means need not be a perfect means, strict scrutiny demands that the Government’s chosen solution must be “neither seriously underinclusive nor seriously dverin-clusive.” Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 805, 131 S.Ct. 2729, 2741-42, 180 L.Ed.2d 708 (2011).

. To the extent that there may. be additional administrative costs incurred in crafting an appropriately tailored exception to the contraceptive mandate, RFRA contemplates such costs and, places them squarely on the Government's shoulders. Even if the Government were to require female employees of exempt employers to fill out the sort of all- ' too-familiar paperwork associated with receiving health, insurance, such a “burden”— ■ in contrast to being forced to either violate a sincere religious conviction or face steep monetary penalties — would be, at most, “de minimis.” Cf. Catholic Health Care Sys. v. Burwell, 796 F.3d 207, 220 (2d Cir.2015).

. Let justice be done though the heavens may • fall.